LALANCE & GROSJEAN MFG. CO. v. NATIONAL ENAMELING & STAMP-ING CO.

(Circuit Court, S. D. New York. April 11, 1901.)

1. PATENTS—RIGHTS OF JOINT OWNERS—CONVEYANCE OF RIGHTS BY PART OWNER.

A part owner of a patent has the legal right to convey to others the right to make, use, and vend the patented article, without the consent of his co-owner, and the latter cannot maintain a suit for infringement against the grantees.

2. SAME.

Evidence considered, and held insufficient to establish a contract between the owners in common of a patent that neither should sell its interest or grant licenses thereunder without the consent of the other.

In Equity. Suit for infringement of patent. On final hearing.

Walter D. Edmunds, for complainant.

Louis Marshall, for defendant.

COXE, District Judge. This is a suit for the infringement of letters patent No. 527,361, granted to Hubert Claus for improvements in enameling metal ware, granted October 9, 1894. On the 16th of November, 1894, Claus duly assigned the patent to the complainant and the St. Louis Stamping Company. On the 31st of January, 1899, the St. Louis Company duly assigned its half interest in the patent to the Haberman Manufacturing Company, Kieckheffer Bros., and Matthai, Ingram & Co., who in turn assigned it to the defendant. The legal title to the patent is, therefore, in the complainant and defendant, each owning a half interest.

The validity of the patent and its infringement are, of course, admitted, the defendant insisting that it has the same right as the complainant to practice the invention.

The complainant contends—First, that the St. Louis Company could not convey to the defendant the right to make, use and vend without the consent of the complainant; and, second, that even if this proposition cannot be maintained broadly, the evidence establishes a trust relation by which the patent was held for the joint benefit of both the original owners and was not to be disposed of except by mutual consent.

The first of these propositions has never been directly passed upon by the supreme court, but the overwhelming weight of authority

in this country and in England is against the view asserted by the complainant. Indeed, but one authority is cited in its support—Pitts v. Hall, 3 Blatchf. 201, Fed. Cas. No. 11,193, decided in 1854—which has never, so far as the court has been able to ascertain, been followed in a carefully considered case. It is not thought that the learned judge who denied the motion to dismiss the bill in the infringement suits against the Haberman Company and others (C. C., 93 Fed. 197) intended to express a definitive opinion upon the question now under discussion. He considered the question an open one, but disposed of the motion upon other reasoning, which, at that stage of the litigation, appears to be unanswerable. The authorities supporting the defendant's contention are too numerous to cite, but the argument in its support will be found sufficiently stated in the following: Clum v. Brewer, 2 Curt. 506, Fed. Cas. No. 2,909; Vose v. Singer, 4 Allen, 226; Dunham v. Railroad Co., 7 Biss. 223, Fed. Cas. No. 4,151; De Witt v. Manufacturing Co., 66 N. Y. 459; Manufacturing Co. v. Gill (C. C.) 32 Fed. 697; Whiting v. Graves. 3 Ban. & A. 222, Fed. Cas. No. 17,577; Pusey & Jones Co. v. Miller (C. C.) 61 Fed. 401; Walk. Pat. §§ 294, 295. See, also, the recent and well-considered case of Blackledge v. Manufacturing Co., 95 O. G. 1853, 108 Fed. 71. It is thought that a rule so generally recognized will not be disturbed, but in any view it is too firmly established and has been enforced for too long a period to be disregarded by this court.

The second proposition urged by the complainant is that the evidence tends to establish an oral agreement between the parties at the time the Claus patent was purchased that neither corporation should grant licenses under the patent or sell its half interest therein without the consent of the other. The court entered upon an examination of the proof with the inclination to find such an agreement if possible, but, after a careful reading of the record, is constrained to reach the conclusion that the proof is wholly insufficient to sustain such a finding. The reasons for this conclusion are as follows:

First. The bill fails to allege such an agreement. The averment is "that it was fully understood, if not expressly agreed, by and between your orators and the St. Louis Stamping Company, that each of them should enjoy, respectively, the privilege of using said invention, and of making and vending the articles containing the same in their aforesaid respective remotely separated businesses, and without further accountability to each other." This is far from stating an agreement of any kind, much less an agreement that neither party should exercise the legal rights growing out of the half ownership without the other's consent.

Second. The only witness who swears to facts tending to establish an agreement is the complainant's vice president, Mr. Cordier. His testimony will be found on analysis to be vague, indefinite, uncertain and insufficient, even if uncontradicted, to establish a clear and unambiguous contract—such a contract as the court would be justified in enforcing. When asked to state what he and the other officers of the complainant understood to be the agreement he an-

swers without hesitation, but when asked what was said and who said it, he leaves the court entangled in a maze of uncertainty and doubt. The court cannot resist the conclusion that the mind of the witness has become so imbued with the idea that the defendant's conduct was unfair that he has, unwittingly perhaps, permitted imagination to take the place of facts and has substituted what he thinks the agreement should have been for what the agreement actually was. If the question were what the parties should have done there would probably be little disagreement between the complainant and the court, but this is not the question. The code of morals which commands the defendant, who has had his coat taken in replevin, to give his cloak also to the successful plaintiff, is from an ethical point of view without a flaw, but it has never been followed in a single reported case. The golden rule is not as yet a rule in equity. A few quotations from Mr. Cordier's testimony will illustrate the difficulty the court has found in accepting it as proof of an enforceable agreement:

"Q. 10. What was the prime motive which led your company and yourself to make this purchase? Was it in order that you might manufacture these goods under the patent, or in order to prevent your rivals in business, the Haberman Manufacturing Company, Matthai-Ingram and others from getting the patents themselves and introducing these cheap goods? A. Principally to keep it out of other hands. Q. 11. Mr. Niedringhaus satisfied you by his statements made to you and Mr. Grosjean in your presence that, unless you purchased this patent together with his company, it would get into the hands of Haberman or others of your rivals and prove injurious, did he not? A. He did positively." "Cross-Q. 207. My question then referred to what conversation it was took place between you and the St. Louis Stamping Company and its representatives at the time when you acquired this patent from Claus? A. I can't remember the exact language, sir. Cross-Q. 208. But the substance of it was that you were each to acquire a half interest in the patent and each to pay one-half of the consideration money? A. We agreed at first to be licensed under that patent, and then we had an arrangement with Mr. Claus by which we could become absolute owners of the patent by paying $30,000 more, and we agreed after that to buy the patent of him. Cross-Q. 209. And you did buy it? A. And we did buy it. Cross-Q. 210. And you each owned a one-half interest in the patent? A. That is right. Cross-Q. 211. And that was all that was said on the subject? A. A great deal was said that I can't remember now. Cross-Q. 212. I know, but that was the substance of all that was said? A. That was the substance. * * * Cross-Q. 215. There wasn't anything said to the effect that the Lalance and Grosjean Manufacturing Company should not be permitted to sell out its business? A. It never came up that I know of. * * * Cross-Q. 262. You never entered into any contract on that subject with the St. Louis Stamping Company? A. Entered into any written contract? Cross-Q. 263. Yes. A. No, sir. Cross-Q. 264. You never made any contract at all on that subject? A. It was always agreed that we wouldn't license. Cross-Q. 265. Give me the language of any conversation in which that matter came up. A. I can't give you the exact language. It was absolutely agreed between us that we would not. Cross Q. 266. When was it agreed? A. Why, in our general conversations. Cross-Q. 267. Tell me one conversation? A. I can't give you the date. Cross-Q. 268. Who was present? A. I can't recall; I haven't got the exact facts in my mind. Cross-Q. 269. Who was the person with whom you had the conversation? A. Why, Mr. Niedringhaus was the man we had all of our conversations with. Cross-Q. 270. Now tell me one single conversation upon that subject, where it occurred and when it occurred? A. I couldn't do that. Cross-Q. 271. You can't tell me the time or place when any conversation occurred? A. No, I cannot. Cross-Q. 272. Will you tell me what was said in that conversation? A. I can't remember."

Third, But the testimony of Mr. Cordier is not uncontradicted. Mr. Niedringhaus, who represented the St. Louis Stamping Company, contradicts him upon every material point and, even if the issue stood between these two men, there certainly is no preponderance in favor of the complainant.

Fourth. The controlling influence and master-mind of the complainant company is Mr. Florian Grosjean, its president. It is perfectly plain from the record that no important step was taken without his knowledge and consent, in fact he dominated and controlled the entire situation. He knew the precise scope of the agreement between the companies, for he made it. Mr. Cordier says, "Mr. Niedringhaus had a great many conferences with Mr. Grosjean, at most of which I was present." Mr. Niedringhaus, Mr. Brown and Mr. Untermyer testify to repeated instances in which Mr. Grosjean made statements to them utterly inconsistent with the present contention of his company and yet Mr. Grosjean was not called as a witness. The excuse offered in the complainant's brief, that the most active agent representing the complainant in the negotiations was Mr. Cordier, and, therefore, Mr. Grosjean was not needed, seems wholly insufficient. There is no way to escape the inevitable presumption that Mr. Grosjean did not contradict Mr. Niedringhaus, Mr. Brown and Mr. Untermyer because he could not do so truthfully.

Fifth. Four years after the assignment of the patent an effort was made to secure a written agreement between the parties limiting the right to grant licenses. On the 18th of September, Mr. von Briesen, who was the counsel for both parties, at the suggestion of Mr. Cordier, addressed a letter to the complainant in which he says:

"In reply to so much of your inquiry as relates to the question of granting a license to other enamel works, I would say that you ought not to do this without the written consent of the St. Louis Stamping Co. Although at present I suppose there is no agreement between you and the St. Louis Stamping Co. preventing you or them from granting licenses without the written consent of the other party, yet you should act as though there was such an agreement. As a matter of fact, I think for the protection of both parties a short agreement providing that neither you nor the St. Louis Stamping Co. should grant licenses or other rights under the patent without the written consent of the other ought to be entered into without delay."

It will be noted that in this letter the counsel who advised the purchase of the Claus patent, who drew up the original transfers and who would be more likely than any other person in existence, except the parties themselves, to know all the circumstances attending the purchase of the patent, says:

"I suppose there is no agreement between you and the St. Louis Stamping Co. preventing you or them from granting licenses without the written consent of the other." .

It will be noted also that this letter was written after a consultation with a representative of the complainant, and that the suggestion as to the proposed agreement was that it should relate to "licenses or other rights under the patent," and not to a transfer of the patent or the consolidation or sale of the business of either of its owners. A copy of the letter was sent to the St. Louis Company and

there is no pretense that it did not express fully and completely the wishes of the complainant regarding the proposed agreement. After a number of conferences between the parties and their counsel an agreement was drawn up by the latter on or about December 8, 1897, which provided inter alia "that neither of the parties hereto will grant any licenses or privileges of any kind whatsoever under said letters patent without the written consent of the other party first having been obtained, and that neither of the parties hereto farm out or subdivide its interest in said letters patent without the like consent in writing." The St. Louis Company agreed to sign this contract and a time was fixed when the parties should meet and attach their signatures. On the appointed day the parties met and the complainant refused to sign. This incident seems to the court to establish two propositions—First, that there was no previous agreement such as is now asserted; and, second, that the complainant after suggesting that there should be a written agreement and dictating its terms and then repudiating it, is not in a position to assert the existence of any agreement, much less an agreement which prevented all independent action by either party. The reason given for thus withdrawing from the agreement which the complainant had proposed seems wholly inadequate upon the theory that the complainant was sincere in its desire to have its rights limited by a contract. There was no suggestion that the contract should be altered or extended so as to prevent in explicit terms an assignment of the patent. There was nothing but a flat refusal to sign and a positive breaking off of the negotiations. Upon the theory that the complainant after reflection had concluded that its interests were best subserved by leaving the future action of its officers wholly untrammeled, its conduct was perfectly natural.

Sixth. In the summer of 1897 negotiations were commenced looking to a consolidation of all the principal manufacturers of enameled goods, and, although the complainant, for personal and somewhat sentimental reasons, refused to enter the combination the project had the hearty and enthusiastic support of all the complainant's officers, including its president, Mr. Grosjean. The complainant promised to aid the project and abide by the agreement reached and every energy of both parties was bent to the consummation of the consolidation. The arrangements were finally consummated in the latter part of January, 1899. It was not until January 10, 1899, after all the negotiations and arrangements had been acted upon and the St. Louis Company bound to their fulfillment that the complainant abruptly and irrevocably withdrew from the consolidation. If thereafter the course pursued by the St. Louis Company was unfriendly and not in consonance with the former relations existing it must be conceded that there was some ground for its action. It had induced the constituent companies to enter into the consolidation upon the assurance that the complainant approved and desired it. To have abandoned the consolidation upon the withdrawal of the complainant would have subjected the St. Louis Company to just criticism and thrown the trade into confusion to the lasting injury of all concerned. Upon the ethical side of the question much might

be said, but so far as the issue in this suit is concerned it must be held that the St. Louis Company, confronted as it was with a distressing and perplexing dilemma, acted within its strict legal rights.

Seventh. Enough has been said to indicate the reasons which compel the court to refuse the relief asked by the complainant. Generally it may be said that the court is convinced that when the Claus patent was purchased no thought of subsequent complications entered the mind of either party. The parties had been on the most intimate and friendly terms for years, and they purchased the patent in the usual way, each taking a half interest. In neither of the written transfers is there a hint or suggestion limiting the rights of a licensee or joint owner of a patent. Had they dealt with each other upon the harsh supposition that they might one day become enemies it might have prevented subsequent misunderstanding, but they did not do so. Each had confidence in the other and for years peace and good will existed between them. When agreement was no longer possible and war was actually declared it is. not surprising that the spear was substituted for the pruning hook. If the complainant has been injured by the consolidation the injury is one for which the defendant is not responsible. In administering equity the court should keep in mind the conduct of all and the rights of all as the law defines those rights. An attempt to do justice upon any other theory inevitably leads to injustice. The bill is dismissed.