**FUL-VUE SALES CO. et al.**
**v.**
**AMERICAN OPTICAL CO.**

United States District Court
S. D. New York.

Dec. 29, 1953.

Patterson, Belknap & Webb, New York City, Richard G. Moser, Dennis C. Mahoney, New York City, of counsel, for plaintiff.

Pennie, Edmonds, Morton, Barrows & Taylor, New York City, R. Morton Adams, Frank F. Scheck, New York City, of counsel, for plaintiffs.

Root, Ballantine, Harlan, Bushby & Palmer, New York City, Hector M. Holmes, Boston, Mass., John E. F. Wood, W. Tyler Peabody, New York City, of counsel, for defendant.

McGOHEY, District Judge.

This action is described by the plaintiffs as "a suit by one partner in a joint venture to obtain its rightful share of the benefits derived by the other partner from use of one of the assets of the venture." They state their theory as follows: "It is Ful-Vue's position that it and American Optical Company together entered into a joint venture for the purpose of acquiring the stock of Universal Optical Company and that as part of that venture they acquired an invention which American Optical has used without sharing the benefits with Ful-Vue." The patent referred to was issued Aug. 15, 1939 to Universal Optical Company, the assignee of its employee W. S. Searles, the inventor. It is hereafter called the Searles patent.

The complaint asks an accounting, damages for alleged infringement of the Searles patent and a permanent injunction against future infringement.

The defendant denies liability to account and infringement, and counterclaims for specific performance of an oral agreement pursuant to which the plaintiff Kimmel, acting for himself and Ful-Vue Sales Company, is alleged to have received the Searles patent from Universal Optical Company and promised to assign it to the defendant.

As will hereafter appear, the "joint venture" was an enterprise in which Ful-Vue Sales Company in combination with American Optical Company effectively destroyed competition by Universal Optical Company. That competition had threatened, if not checked, to break up or at least seriously impair the effectiveness of a patent licensing system by which Ful-Vue Sales Company and American Optical Company together fixed and maintained prices on spectacle frames sold in interstate commerce.

The complaint and the counterclaim are dismissed.

The case was tried to the Court alone. The facts found, follow.

Ful-Vue Sales Company (hereafter called Ful-Vue Sales) is a copartnership which at all times here relevant engaged in the business of holding patents and issuing licenses thereunder. It does not manufacture, sell or offer for sale, devices covered by its patents. Its place of business is in Washington, D. C. George Kimmel is its managing partner. His home is in Maryland. He has practiced as a patent lawyer for more than forty years and is a member of the law firm of Kimmel and Crowell, which specializes in patent and trademark causes in Washington, D. C. The other members of the copartnership and their places of residence and citizenship are as follows: Robert E. Hillier, Bessie Hillier, and Ruth E. Hillier, Akron, Ohio; Julius Tuvin, Long Island City, N. Y., Rose E. Emons, Wilmington, Del.; Gayle N. Kimmel Weaver, San Diego, Cal.; and N. Richard Kimmel, Silver Springs, Md.

Darby and Darby is a law partnership having its offices in the City of New York. At all times here relevant Darby and Darby were the attorneys for Ful-Vue Sales and Kimmel.

American Optical Company (hereafter called AO) is a voluntary association organized and existing under the laws of Massachusetts. It is a manufacturer and distributor of optical and ophthalmic products, including spectacle frames and lens mountings. Its principal place of business is at Southbridge, Mass. It also has a regular place of business in New York City, in the Southern District of New York.

The amount in controversy exceeds $3,000.

In 1930 Ful-Vue Sales owned certain patents [1] relating to spectacle frames having a high end-piece mounted at the temples above the horizontal median line. These came to be known in the optical industry as the Ful-Vue patents. By an agreement dated Jan. 10, 1930 (amended Sept. 2, 1931) Ful-Vue Sales granted AO the exclusive right to make, use and vend the inventions covered by claims of the Ful-Vue patents. By the agreement as amended AO had the right to sublicense other manufacturers; to retain all royalties in excess of amounts agreed to be paid by AO to Ful-Vue Sales upon each patented unit manufactured and sold by such sublicensees; Ful-Vue Sales was obligated to protect the Ful-Vue patents and to proceed against infringers. It was also obligated to bear part of the expense of enforcing the sublicense agreements.

On Sept. 26, 1931 AO granted a sublicense to Universal Optical Co. (hereafter called Universal), a Rhode Island corporation engaged in the manufacture of optical goods in Providence, R. I. This reserved to AO the right "to determine and fix the prices, discounts, terms, sales plans, and sales regulations covering the sale of said patented articles and to change the same from time to time" and permitted Universal "to sell said * * * articles only at the prices and discounts and under the terms, sales plans and sales regulations determined and fixed by the Licensor." By it Universal was required "to adopt and to follow the said schedules as herein provided and not to sell the said patented articles on more favorable terms either directly or indirectly." [2]

AO granted similarly conditioned sublicenses to other optical manufacturers until "generally speaking it [Ful-Vue patent licensing program] was the sustaining element of the entire [optical] frame industry." [3] "* * * the entire industry became sublicensees under AO exclusively." [4] "The Ful-Vue set-up comprised the Ful-Vue Optical Co., the Ful-Vue Sales Co., and the whole sublicensing industry." [5]

In 1936 Universal ceased paying royalties to AO which thereupon instituted suit on Aug. 14, 1936 to enforce the sublicensing agreement. That litigation was financed partly by AO and partly by Ful-Vue Sales, pursuant to their original licensing agreement. On Sept. 12, 1936, while that litigation was pending, Universal by notice cancelled its sublicense pursuant to its terms.

In Oct. 1936, Ful-Vue Sales, through Darby & Darby, after consultation with AO's officials, commenced negotiations to acquire Universal's stock, for the specific purpose of "putting an end to the litigation and protecting Ful-Vue's and AO's common interest in the Ful-Vue patent monopoly." [6] Darby & Darby acted under the joint direction of Kimmel, representing Ful-Vue Sales, and Francis M. Shields, representing AO of which he was a vice-president. While these negotiations were in progress, Ful-Vue Sales, on Dec. 31, 1936, after consulting AO, instituted suit against Universal alleging that the "Clearway frame," which was similar to the Ful-Vue frame and which Universal purported to manufacture under its so-called Bosworth patents,[7] infringed the Ful-Vue patents.

On July 7, 1937, Kimmel acquired control of Universal through the purchase of the majority (about 85%) of its stock. He was acting in this for Ful-Vue Sales and AO, each of which furnished one-

1. At that time the Ful-Vue patent series was comprised principally of the following: U. S. No. 1,685,192; No. 1,739,049; Des. 73,074; Des. 73,075; Canadian No. 274,841; Canadian Reissue No. 296,512; German No. 465,126; U. S. Application No. 370,885.

2. Pl.Ex. 309.

3. Mosher testimony, S.M. 403.

4. Kimmel testimony, S.M. 664.

5. Id. 709.

6. Id. 709 ff.

7. The Bosworth patent series was comprised of: U. S. No. 2,047,938; No. 2,071,058; Des. 84,024; Des. 84,678; No. 1,935,433; No. 1,953,922.

half of the purchase price of $275,000. In order to conceal the true new ownership of Universal, Keth Products Corporation was organized in July, 1937, for the sole purpose of holding the Universal stock. Ful-Vue Sales and AO each contributed one-half of Keth's capital which consisted of $1,000 represented by 1000 shares of common stock. Initially this stock was held in the joint names of Kimmel as nominee for Ful-Vue Sales and Shields as nominee for AO. Changes in the actual record ownership were made later in order to conceal AO's interest,[8] but at all times it was the intention and understanding of Ful-Vue Sales and AO that throughout the life of Keth each would own a one-half interest in Keth's stock and that each would thereby beneficially own an undivided one-half interest in the majority stock of Universal and thus have control of the latter's business so as to prevent it from being a "thorn in the side" of the Ful-Vue patent licensing system.

AO and Ful-Vue Sales each paid Shields $6,000 a year to supervise the operations of Universal for them. These payments, which appear not to have been disclosed to the minority stockholders of Universal, were in addition to a salary of $6,000 and commissions he received from Universal. While Kimmel and AO thus controlled the stock through Keth, and the business policy and operations through Shields, Universal was hampered in its manufacturing and sales operations by restrictions imposed by AO and Ful-Vue Sales so as to prevent Universal from disturbing the "Ful-Vue set-up."[9] As a result, Universal lost money. Kimmel was greatly disturbed by this and suggested dispensing with Shields in order to save expense. AO's vice president and general manager, Ira Mosher, pointed out that without Shields, Sweeney, an official and minority stockholder of Universal, might disregard prescribed price schedules; and indicated that the expense of keeping Shields was not too high for the protection he afforded. In April 1939, AO yielded to Kimmel's urging and agreed to the sale of their jointly owned Universal stock. Shields was directed to look for a buyer and after prolonged negotiations a sale was closed on Oct. 21, 1939, for $200,000.

Kimmel and AO had purchased the Universal stock "to remove a thorn in the side" of the Ful-Vue patent licensing system by which they were able to control the retail price of Ful-Vue frames.[10] By securing control of Universal, they had, so to speak, pulled the "thorn" but had not destroyed it. Universal, under hostile or uncooperative management, could again become a "thorn in the side" unless before sale it were stripped of all patents which might impinge on the Ful-Vue high end-piece structure and particularly those patents under which the former management claimed to manufacture the "Clearway" frame.[11] Accordingly, when it was decided to sell, Kimmel asked that AO's patent attorneys make a study of all the patents and patent applications owned by Universal and decide "what ones of them are likely to be of any value or nuisance value to the Ful-Vue set-up." These, he said, "should be assigned to Ful-Vue Sales Company" and "whatever transfer is made should be made at the earliest possible date." He did not propose to pay for any patents so transferred. It was his view that since "one of [his] main purposes in buying Universal was to protect the Ful-Vue set-up" and since he now "own[ed] control" of Universal, he had "the right to make any transfer of any of the business property as [he saw] fit." While he was anxious to have Universal's directors "see

8. This became necessary when at a meeting of optical retail dealers in New York one of AO's officers, in order to avoid embarrassment by a question from the floor, falsely replied that AO had no interest in Universal.

9. Pl. ex. 132, 137, 145.

10. Indeed Kimmel, on visits to sublicensees throughout the country, used Universal as an example of what happened to anyone who attempted to violate the Ful-Vue patent licensing system. (Pl.Ex. 175.)

11. See Kimmel S.M. 871; see also Mosher S.M. 1029.

that it does not even have the appearance of a personal desire" and to give their formal approval, this, he pointed out, could be done by himself and Shields who constituted a majority of the directors of whom Sweeney was the third.

AO's patent attorney after examining Universal's list of patents advised that the Bosworth patents which "are of importance to the Ful-Vue set-up" and some others which "might turn out to be of some importance" "should be retained in any sale that is made of the Universal Optical Corporation." He also recommended that the Searles patent here in issue, although it has no relation whatever to the Ful-Vue high end-piece structure, should be retained because, he said, it was of importance to AO.

The Searles patent relates to a multiple-leaf spring strap lens mounting for attaching lenses to the frame of a rimless or semi-rimless spectacle. AO was at that time and still is the owner of a patent issued on Jan. 25, 1938, to AO as assignee of E. M. Splain, one of its employees. The Splain patent also relates to a multiple-leaf spring strap lens mounting for attaching lenses to the frame. It was issued after an interference proceeding involving his and Searles' applications had been terminated by concession of priority to Splain on Sept. 29, 1937. Universal, which was then under control of Kimmel and AO, executed the concession as Searles' assignee. Darby & Darby approved the concession prior to its execution, after a study of the interference file for Kimmel at his direction. Kimmel himself also studied the interference file and at least made no protest against the concession. He also signed a waiver of notice of the meeting of the Universal directors, which stated that it had been called "for the purpose of authorizing Mr. Sweeney to execute a concession of priority in the matter of multiple spring strap interference. * * *"

■ Kimmel at first demurred to taking the Searles patent because, he said,

he doubted "whether [he] could sustain a claim of right" to this since it did not relate to the "Ful-Vue set-up." AO's patent attorney rejected Kimmel's theory for justifying immediate transfer and suggested that the reservation of the patents ought to be postponed and be made to appear as one of the considerations for agreeing to sell for $200,000. This was the amount Mosher and Kimmel thought was, under the circumstances, as good a price as they could expect for their Universal stock. Kimmel protested delay in getting the patents which related to the "Ful-Vue set-up" but did not go through with his plan for immediate taking. AO's patent attorney urged an "earnest effort" to get the Searles patent and said that Kimmel should discuss the matter with Mosher. It is common ground between the parties that Kimmel and Mosher did discuss the matter and agreed that at the closing Kimmel would take an assignment to himself of all the patents, including Searles', as recommended by AO's patent attorney. But they are not in accord as to what agreement Mosher and Kimmel reached concerning later disposition of the patents. There are many references to this in the voluminous correspondence [12] put in evidence; but these do not add materially to the testimony of Kimmel or Mosher at the trial. Having observed and heard both witnesses, I accept the testimony of Mosher on this point. He has no pecuniary interest in the outcome of this trial, having severed his connections both as officer and stockholder of AO by Nov. 1944, long before this action was commenced in June 1949. His testimony on the point was clear and forthright. Kimmel, on the other hand, has a substantial pecuniary interest in the outcome here. His demeanor did not induce reliance on his testimony. When asked by the Court whether he had ever told Mosher he would give the latter the Searles patent, Kimmel made this revealing reply: "I think I let him think that ultimately they would get the patents, ultimately." I find then, that some time

12. The parties waived all claims of privilege as to communications between them and their respective attorneys. Many such letters were received in evidence.

between April 17 and Oct. 21, 1939, Kimmel and Mosher also agreed, as Mosher testified: (a) that the Bosworth patents were to be acquired for the sole ownership of Ful-Vue Sales; (b) that certain so-called Rimette patents (not here in issue) were to be acquired for the joint ownership of Ful-Vue Sales and AO; (c) that the Searles patent was to be acquired for the sole ownership of AO; and (d) that after receiving assignment of these patents from Universal in his own name Kimmel was to assign them in accordance with this agreement.

A few days before the date of closing Kimmel did try to induce AO, as part of their mutual financial adjustments, to modify the agreement and to agree to pay him to carry out his commitment as to the Searles patent. AO refused. I find therefore that the foregoing agreement as to ultimate disposition of the patents was in full force and effect at the closing on Oct. 21, 1939 when Universal, which Kimmel controlled for himself and AO, assigned the patents to Kimmel individually. I find also that Kimmel received these assignments subject to that agreement.

After the sale was completed and he had title to all the patents, Kimmel refused to assign the Searles patent to AO. He repeatedly asked AO to acknowledge him as "co-owner" and as a "trustee" holding the patent for AO and himself, and to pay him for assigning it to AO. AO rejected these pleas. Mosher insisted that under their agreement in force when the sale was closed through which Kimmel got the patents, he took the Searles patent for AO's sole benefit and he demanded that Kimmel assign it to AO which in their agreement had waived all its claim to half-ownership in the Bosworth patents. Kimmel ignored Mosher's demand and set about to find some way to force AO to pay him for such assignment. With his Washington law partner Crowell, he began a search for evidence to support "a suspicion" which he then for the first time told Darby he had "had for some time," that AO was "infringing" the Searles patent by a multiple spring strap lens mounting called "Triflex" which AO had first marketed in 1935. Kimmel, for reasons which will later appear, was at pains to conceal from AO both his "suspicion" and his search for evidence. Thus at the time when, according to his own version, he was "co-owner" with AO of the Searles patent and "trustee" of AO's half interest therein, Kimmel was clandestinely maneuvering into position to assert against his "co-owner" and "beneficiary" a claim for "infringement" of the patent.

Early in Dec. 1939, Ful-Vue and AO agreed in principle that all the patents which had been acquired from Universal should be assigned under escrow to Darby & Darby until there should be a resolution of the controversy which had arisen from Kimmel's refusal to assign the Searles patent to AO. This agreement which was oral was reached at a conference arranged by Kimmel and held at the office of Darby & Darby. The conferees were Kimmel, his attorney Samuel E. Darby, Jr., Mosher, and Gilman Wallace, one of AO's attorneys. Wallace was directed to prepare a draft of the escrow agreement. When by Dec. 16 Wallace had not yet submitted a draft, Kimmel wrote Darby as follows:

> "Both of us [13] think that Wallace's excuse of being too rushed to draft a form of escrow agreement is not exactly a statement of what is bothering them. What probably happened when they got back to Southbridge and discussed the proposed settlement with Styll and possibly Lyman, they discovered that the settlement to which they had agreed would not let them have what they thought they were going to get. In other words, it leaves them still worried as to the future and I would not be surprised if they should attempt to reopen negotiations or at least try to find out what is back in our minds about this matter.

13. "Us" apparently refers to Kimmel and his partner Crowell.

"I am expecting to leave for Florida the last of the week, but will be back during the week of January 8th in connection with a case in the Courts here. Then I will go back to Florida where I can conveniently stay for several months straight if that seems advisable. I am not going to Southbridge to give them a chance to shoot at me, at least until after this agreement is all completed."

On Jan. 10, 1940, Wallace sent his first draft of the escrow agreement to Darby who forwarded it to Kimmel the next day with the comment that he thought it was "in entire keeping with what was agreed to at my office." On Jan. 16, 1940, Kimmel replied as follows:

"This escrow agreement is simply not usable at all. They would like nothing better than for me to sign the agreement as drafted by them. That would tie my hands absolutely since it would take both of us to decide to do anything and they would never agree with me to do anything with the patent. There is no need to hurry, however, about this escrow agreement and I may get a chance to see you for a while at the time you are in Florida. I think we are going to have to insist on what amounts to an assignment of these patents to Darby & Darby, not simply to hold them inactive, but to hold them as in the nature of an active trustee for the partnership owners (AO and Ful-Vue). They would want nothing better than to make it utterly impossible for me or you to move against anyone who might be using any of these patents. That would nullify the patents for the purpose for which patents are granted and therefore we must insist that patents be assigned to you so that you can enforce the legal rights that ownership of the patent gives to whoever owns them whether as trustee or otherwise."

Darby thereupon prepared a draft in substantially the form finally executed.

After Kimmel signed this it was forwarded to Wallace. Wallace wrote Darby that the language of the agreement as then drawn might be construed to constitute a recognition by AO of Kimmel's claim to half ownership of the Searles patent. Accordingly, he suggested amendment so as to make it clear that no such recognition was being made by AO. Darby replied as follows on Aug. 21, 1940:

"I believe both Mr. Kimmel and I fully realize that there is a dispute between AO Co. and Kimmel with respect to the Universal patents under the escrow agreement, * * *. However it was because of that dispute that the escrow agreement was suggested and agreed to; and under the terms of the escrow agreement, as I understood it then and understand it now, no patents can be sold or assigned without the joint consent of the parties—this to temporarily take care of the dispute. On the other hand, any proceeds obtained through the patents, other than by sale and assignment, were to be distributed equally between the parties. In consequence the escrow agreement was prepared worded as are worded the copies signed by Mr. Kimmel. I do not see how under the circumstances that can constitute a recognition of Mr. Kimmel's claim. If AO Co. recognized Mr. Kimmel's claim there would not be any necessity for the escrow agreement."

On Aug. 29, 1940, Wallace forwarded to Darby the executed escrow agreement with the following letter:

"Although I must confess that I cannot see why the proceeds of the patents and applications covered by our Escrow agreement should be treated any differently than the patents and applications themselves, I do not care to press my objections any further.

"It is of course highly improbable that there will be any proceeds available for distribution during the

life of the agreement. We are not however disposed to make any disposition of the patents and applications on the basis proposed by Mr. Kimmel. Mr. Mosher still continues to be willing to make the division on the basis originally agreed upon between him and Mr. Kimmel, namely transfer of the Eyewire [14] and Triflex [15] patents to the American Optical Company and the Bosworth patents to Mr. Kimmel.

"There are enclosed herewith three copies of the Escrow agreement in the form proposed by you. Two have been signed by Mr. Kimmel. All three bear the signature of Mr. Mosher. Will you kindly sign the receipt form on page 2 and return one complete copy for our files."

On Sept. 4, 1940, Kimmel assigned to Darby & Darby "the entire right, title and interest" in all the patents he had acquired from Universal. The escrow agreement, after reciting that "Kimmel and AO * * * have certain rights to the proceeds from the sale or other disposition of the said patents and are unable to agree upon what is best to be done with said patents," and that the parties had agreed that the patents should be placed in escrow until the differences between them with respect thereto had been reconciled, provided that the patents should be assigned to Darby & Darby to be held in escrow "for the benefit of the parties hereto and for equal distribution to said parties of any proceeds that might be derived therefrom until said George P. Kimmel and American Optical Company agree upon the sale, assignment or transfer thereof." In practice this agreement was construed by the parties to it and by Darby & Darby as also requiring the latter to secure the consents of Kimmel and AO before issuing licenses under the Searles patent. No licenses were ever issued.

During January and February, 1940, while the discussions were going on between Darby and Wallace about the form of the escrow agreement, Kimmel, together with his partner Crowell, was conferring with AO's vice-president Cozzens in order to induce the latter to have AO manufacture and market a so-called "two-way" spectacle frame under license from Ful-Vue Sales which owned a patent covering such a frame. On Feb. 17 he wrote Darby about a conference he had attended in Southbridge, Mass. He told Darby that while there he had had no conversations about the escrow agreement with anyone at AO, and also that he had no objection "to forgetting if possible" the matter of getting the disputed patents in the name of Darby & Darby, "until two-way is placed on the market." He said he feared, however, that AO would not let the escrow wait, and so he planned to make himself unavailable for conferences about it, by remaining in Florida until April, and cautioned Darby how to handle the matter during his absence. Darby replied as follows:

"I agree with you that we should not bring this question up until we are squared away on the 'two-way' proposition. If they should bring it up I will handle it so as not to 'upset the applecart'. If my hand is forced on the matter I will prepare a simple assignment from Ful-Vue to me and forward it to Mosher or Wilson for their approval. I do not want to do this however until after the 'two-way' is taken care of unless my hand is forced.

"I anticipate that on sending the simple assignment that will raise questions which will have to be talked out, and in that way I can drag the matter along further."

■ I find that it was Kimmel's intention and purpose to induce AO to execute an escrow agreement whose lan-

14. This refers to the Rimette patent. Originally AO wanted this as well as Searles but, as found above, finally agreed that it

should be taken and held for AO and Kimmel jointly.
15. Searles.

guage, though apparently recognizing and preserving AO's claim to sole beneficial ownership of the Searles patent as Darby said it did and was intended to do, would in Kimmel's opinion be susceptible of a construction which would enable him to assert, as he now does, that AO in the escrow agreement in fact gave up its claim; and would, moreover, enable him also to assert claims for accounting and infringement against AO. It was also Kimmel's plan and purpose, in which he indeed succeeded, to conceal his true intentions from AO and to withhold assertion of his claims until after the escrow agreement was signed and until such later time as he might deem it safe to assert them without danger to other profitable business arrangements he then had with AO. These included the then existing Ful-Vue patent licensing system and the then pending negotiations for licensing AO under Ful-Vue's "two-way" patent and the marketing of the "two-way" frame by AO. In 1939 and 1940, moreover, the Antitrust Division of the Department of Justice was investigating the Ful-Vue patent licensing system and was examining Ful-Vue Sales' records. Thus it was then clearly to Kimmel's personal advantage also not to institute a suit in which he would have to disclose, as he has done here, the functioning of the "Ful-Vue set-up," the purpose and details of the Universal deal and the acquisition of Universal's patents. Indeed, on Sept. 16, 1940, the Government filed its complaint in a civil action in this court to enjoin alleged violations of the Sherman and Clayton Acts by Ful-Vue Sales, Kimmel, AO, Mosher and other AO officials in the conduct of the Ful-Vue patent licensing system.

Some time in 1940 the "two-way" negotiations were concluded to Kimmel's satisfaction. The last of the original Ful-Vue patents did not expire until Dec. 1946. The Government's suit pended until Sept. 17, 1948, when it was terminated by a consent decree which in effect dissolved the Ful-Vue patent licensing system. In a letter dated Jan. 10, 1949, Kimmel for the first time demanded an accounting of AO. The latter denied any basis of accountability and rejected the demand. On June 2, 1949, Darby & Darby wrote AO that "It has recently been called to our attention" that since prior to the escrow agreement "your company has been manufacturing, selling and offering for sale, spectacle frames embodying the invention claimed [in the Searles patent] title to which is now held by our firm under [the escrow] agreement." The letter further informed AO that "we intend to institute a suit" for injunction and accounting. Now it was clearly untrue that Kimmel and Darby had only "recently" learned whatever facts they thought showed that AO's "spectacle frames embod[ied] the invention claimed" in the Searles patent. Kimmel and Crowell testified that their earlier "suspicions" of infringement were confirmed by Splain in January, 1940. And Kimmel, in a letter dated Aug. 20, 1940, told Darby " \* \* \* AO does not even know that we are aware that they are actually using the [Searles] structure instead of their own." (This presumably refers to AO's Triflex mounting.) The instant complaint was filed on June 11, 1949.

■ Kimmel admits he never disclosed to Mosher his alleged suspicions of "infringement" or his claim to an accounting, although they were in frequent communication on other matters. And Mosher was the man with whom he had negotiated and executed the Universal deal. Kimmel testified at one point that he had orally disclosed his claims to Cozzens, AO's vice-president in charge of sales, at various times beginning in the early summer of 1940 and thereafter; that Cozzens asked him to hold off because of the Government's investigation and suit, and that he withheld suit in response to this request. At another point, however, Kimmel testified: "I didn't accuse the American Optical Company, through Mr. Cozzens, of infringing or stealing." And Crowell, who claims to have been present, testified: "I can't recall any use of the

words that American Optical Company was infringing in any of the conferences there." Cozzens it is noted has been dead for several years. Further, it is to be noted that according to Kimmel no one else except Crowell ever participated in these alleged disclosures to Cozzens; even Crowell was not always on hand, and if others were ever in the vicinity they were always out of ear-shot during the alleged disclosures. Kimmel, moreover, admits that he never disclosed his claim of infringement to anyone connected with AO who is still alive. I do not accept Kimmel's testimony that he disclosed his claims to Cozzens; or Crowell's of similar tenor. A copy of a letter dated Dec. 2, 1944 is the only writing Kimmel produced from him to Cozzens which mentions the Searles patent. This is a plea that Cozzens help Kimmel to recoup some of his expenses in the Universal deal. Kimmel, claiming only to be "an owner" of the Searles patent, proposed that AO agree to grant licenses jointly under the Searles and Splain patents, and share with him the royalties from such licenses. The letter asserts no right to an accounting or claim of infringement and does not disclose or suggest any intention to assert such claims then or in the future by suit or otherwise. Indeed Kimmel testified that all he intended to assert by this letter was a claim to be recognized as "an owner" of the patent and not a claim for infringement. Accordingly I find that neither Kimmel nor Darby & Darby, nor anyone on their behalf, at any time prior to Jan. 10, 1949, asserted to AO or to any of its officials a claim for accounting; or, prior to the institution of the instant suit on June 11, 1949, a claim for infringement; or prior to those dates disclosed an intention to assert or to sue on such claims or either of them.

Since 1935, when the Triflex mounting was first marketed, AO has built up a large volume of business in it. The first year's sales amounted to less than a thousand. In 1939, the year Kimmel received assignment of the Searles patent, sales had risen to more than a million. Thereafter they increased annually until 1944 when they exceeded two and a half million. There was a gradual falling off in each succeeding year, but in 1948, the last year for which figures were produced, sales amounted to more than a million six hundred thousand.

■■ On the foregoing facts there appears to be no ground on which the plaintiffs can prevail. For the moment the fundamental question of the legality of the Universal deal as a whole will be put to one side and it will be assumed that whatever agreement Kimmel and Mosher made as to division of the patents taken from Universal was one which the Court should enforce. Under the agreement found to have been made as to such division, there is no basis whatever for Kimmel's claims. If, however, that finding be wrong and the agreement was as Kimmel asserts, namely, that he and AO were to be co-owners of all the patents taken from Universal and he was to receive them as trustee for himself and AO, then in the absence of a special agreement providing otherwise AO, being a co-owner, had the right to use the Searles patent without accounting to Ful-Vue Sales or Kimmel. And, of course, such use would not constitute infringement.[16] The plaintiffs argue that the escrow agreement is such a special agreement. The argument is set out as follows in their brief: "Ful-Vue and American Optical, to satisfy a common interest, entered into a joint venture to acquire the stock of Universal. They thereby acquired, indirectly at least, an interest in the Searles invention which was an asset of Universal. Eventually, the Searles patent was withdrawn from Universal and it then became directly an asset of the joint venture, held in

16. Blackledge v. Weir & Craig Mfg. Co., 7 Cir., 108 F. 71; Lalance & Grosjean Mfg. Co. v. National Enameling & Stamping Co., C.C.S.D.N.Y., 108 F. 77, 78; Bendix Aviation Corp. v. Kury, D.C., 80 F.Supp. 243; Bell & Howell Co. v. Bliss, 7 Cir., 262 F. 131.

trust for their mutual benefit. After extended negotiations and discussions, in which American Optical attempted without success to have the Searles patent removed from the joint venture, a written agreement was finally entered into in effect continuing the joint venture until a division of the patents could be agreed upon. This Final Agreement takes the place of all prior discussions and negotiations and conclusively confirms the rights of the parties to share equally in the Searles patent." But the escrow agreement certainly does not in terms commit AO to share with Kimmel any profits it might get from using Searles' disclosures if it did embody them in its Triflex mounting. It is not contended that AO conceded Kimmel's claim to co-ownership at any other time or in any other instrument, and Kimmel's lawyer assured AO's attorney that the escrow agreement did not constitute such a concession. It is inconceivable that AO, while insisting, as it then was, on its sole right to the Searles patent, would at the same time knowingly consent to pay Kimmel for using its own property. But if AO had in fact consented, surely, as Darby pointed out to Wallace, no mere escrow arrangement would have been resorted to or needed. And Kimmel would not have made himself inaccessible for conferences, by remaining in Florida. On the contrary, it is clear that he would have rushed to reduce AO's commitment to writing in language that would have left possible no room for doubt about AO's commitment to pay him for using Searles' disclosures. Accordingly, the escrow agreement is construed to mean only that AO agreed to share equally with Kimmel any royalties which might thereafter be received from licenses under the Searles patent if any were granted to other manufacturers of spectacle frames.

But even if the words of the escrow agreement as they stand could be stretched to mean what the plaintiffs assert, Kimmel as "trustee" of AO's conceded half interest in the Searles patent could not be permitted to retain and profit from so valuable a concession from his "beneficiary" under the circumstances revealed here.[17]

■ Furthermore, Kimmel's claims, even if they ever had any validity, are barred because he has offered no credible explanation or valid excuse for his delay of almost ten years in asserting them while AO to his knowledge was increasing its sales of the accused Triflex mountings.[18]

■ In addition to the foregoing there is another and more fundamental ground for denying relief to the plaintiffs. It requires, as well, denial of the defendant's counterclaim for specific performance of Kimmel's agreement to assign to it the Searles patent. The claims of both parties are bottomed on the Universal deal and arise directly out of their unlawful combination to stifle Universal's competition which threatened their price control. Both Kimmel's and Mosher's testimony make it clear that the patents were taken in order to make sure that Universal could not again compete in a way that would weaken their system through which they fixed and maintained prices on spectacle frames sold in interstate commerce.

The situation here then is quite different from that in Standard Oil Co. v. Clark,[19] on which the plaintiffs rely. There the Court held that the owners of patents could not be forever deprived of them by the Alien Property Custodian, because at some time prior to his seizure of the patents they had been used by their owners to effect violations of the antitrust laws. The Court, however, did

17. Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1.

18. A. R. Mosler & Co. v. Lurie, 2 Cir., 209 F. 364, 370; Westco-Chippewa Pump Co. v. Delaware Electric & Supply Co., 3 Cir., 64 F.2d 185; Rome Grader & Machinery Corp. v. J. D. Adams Mfg. Co., 7 Cir., 135 F.2d 617, 619; Brennan v. Hawley, 7 Cir., 182 F.2d 945, 947, certiorari denied 340 U.S. 865, 71 S.Ct. 89, 95 L.Ed. 631.

19. 2 Cir., 163 F.2d 917, 926-927.

not thereby enforce, as between the violators, the agreements through which they achieved the purpose of their illegal combination. Indeed, the Court pointed out that it would not lend its aid if the plaintiffs there had been "seeking enforcement of obligations arising under an illegal arrangement".

 The plaintiffs urge that in this record there is no proof of illegality of the Ful-Vue patent licensing system as such; and also that the consent decree in the Government's suit did not adjudicate either that point or that any taint of illegality attached to the patent. Accordingly, they argue, the facts here furnish no basis for the application of familiar principles under which courts refuse to enforce obligations arising out of illegal agreements. But it is immaterial here whether the licensing system as such was legal or whether the patent is free from taint. Kimmel and AO clearly combined to destroy and did destroy Universal's competition by buying control and then making Universal adhere, even at a loss, to their schedules by which prices were fixed and maintained on articles sold in interstate commerce. And when they no longer were willing to bear the expense of this method of stifling competition, still acting in combination they adopted another, namely, withdrawal of the patents which had enabled Universal to compete effectively. The agreements which this Court is asked to enforce were important and indeed necessary elements in the harmonious operation of the scheme through which the unlawful purpose of the combination was achieved. At the very least, they are "so closely related to the performance of acts forbidden by law as to be [themselves] illegal." [20] Their character and that of the combination of which they were parts are not changed by describing the latter as a "joint venture." [21] "It is clear that a contract which violates the laws of the United States and contravenes the public policy as expressed in those laws is unenforceable. * * * This is so regardless of the equities as between the parties."[22] Thus it is of no consequence that, as the plaintiffs point out, no party here has questioned the legality of the agreements sought to be enforced.[23]

In view of what has been said, the questions of infringement and the scope of Searles' claims are not considered or decided.

The complaint and the counterclaim will be dismissed without costs to either side. The Court's findings of fact and conclusions of law are sufficiently set forth above. No others need be submitted.

Submit proposed decree in accordance herewith.

20. Kaiser-Frazer Corp. v. Otis & Co., 2 Cir., 195 F.2d 838, 844.

21. Timken Roller Bearing Co. v. U. S., 341 U.S. 593, 597–598, 71 S.Ct. 971, 95 L.Ed. 1199.

22. 195 F.2d 843, 844.

23. Beasley v. Texas & P. R. Co., 191 U.S. 492, 498, 24 S.Ct. 164, 48 L.Ed. 274.