GENERAL ELECTRIC COMPANY, Plaintiff,

v.

SCIAKY BROS., INC., Defendant.

Nos. 16676, 18338.

United States District Court
E. D. Michigan, S. D.

Sept. 27, 1960.

Dickinson, Wright, Davis, McKean & Cudlip, Detroit, Mich., Fish, Richardson & Neave, New York City, for plaintiff.

Lawrence C. Kingsland and Edmund C. Rogers of Kingsland, Rogers & Ezell, St. Louis, Mo., for defendant Sciaky Bros., Inc., and Welding Research, Inc.

PICARD, District Judge.

We have consolidated two patent suits brought against Sciaky Brothers, welding machine manufacturers, by General Electric Company, manufacturer (among many other products) of welder control devices which are incorporated within electric resistance welding machines by its customers—and also Sciaky's counterclaim against General Electric.

The original suit, 16,676, was filed May 10, 1957, seeking declaratory judgment to determine whether General Electric was free from infringement of four Sciaky Bros. Inc. patents, (later dropped to two) leaving Sciaky patents 2,415,708 and 2,431,083 in dispute. Sciaky filed a counterclaim in this action.

More than a year later, August 21, 1958, General Electric commenced the second action, 18,338, alleging that welding machines which Sciaky manufactures and sells, including control features, infringed eight General Electric patents (later reduced to six).

Each party in both cases accuses the other of laches and estoppel and also advances the usual contentions—invalidity of the other's patents, non-infringement by their own machines, validity of their own patents, and infringement thereof by the other.

These two cases combined for trial occupied from July 7 to August 26, 1959 for the taking of testimony alone, at Bay City, Michigan, totaling about 6,000 pages of record with 154 patents (an unbelievable number) cited and introduced. Counsel then asked and received about seven months for briefs but this was extended to about ten months at the request of attorneys on both sides and during that period voluminous printed briefs were furnished us. Since August, 1959, we have had an oral hearing for a complete day, March 26, 1960, at Bay City, adding 259 pages of further record and since then additional briefs have been filed. Later this court received many letters from the parties altering, adding to, and detracting from briefs that had been filed. To make room for these additions and changes complete paragraphs had to be lifted from the previous briefs of the parties. So that not until about July 16, 1960, were we able to start reading all briefs and letters to prepare for our opinion.

We must here add that counsel for both sides have been very hardworking, efficient, courteous and cooperative. They are gentlemen well versed in patent law and engineering—at least as it extends to welding machines.

Nevertheless we have concluded that if this court were to extensively cover every facet of these cases the opinion itself might consume the greater part of the usual size bound legal volume. It would then be very technical and of no great help in future decisions.

Furthermore we do not deem it necessary to go into a long discussion on the history of welding as its performance and purposes are well known not only to the trade but to others on the outside who may be interested. Suffice to say that the welding art has, over the last

fifty years, developed very much and for a time even taxed the electric load of communities until the development of the three phase approach to the welding problem.

We found that better welding has come chiefly through experimentation and it has been determined that if the metal parts to be welded are subject to a low heat, then a high heat, then back to low heat again—with intervals between, of course; or, sometimes low heat—interval —again low heat, that many steps—the duration of intervals, magnitude of the heat applied, extent of the pressure, the time of its application, are all important, and it is not easy to determine whether the welder is adjusted to give the optimum welding condition; but what is more important is that if the operator has successfully adjusted the welder to give the operation desired then this operation must be assured during all the welding so that during that welding the same adjustment will repeat automatically.

We will decide the second suit, 18,338, first with Findings of Fact and Conclusions of Law; then we will proceed to the first suit, 16,676. But it must be understood that the suits complement each other.

### 18,338

#### Findings of Fact

Herein General Electric alleges that the welding machines which Sciaky manufactured and sold included features that infringed the following six General Electric patents—

| Patent number | Patentee | Filed | Issued | Title |
|---|---|---|---|---|
| 2,361,846 | George W. Garman | 1/25/39 | 10/31/44 | Electric Valve Circuits |
| 2,315,916 | Austyn L. Whiteley and Bertram G. Higgins | 3/20/39 | 4/6/43 | Electric Welding System |
| 2,331,124 | Orrin W. Livingston | 9/13/41 | 10/5/43 | Electric Valve Translating System |
| 2,348,553 | " " " | 4/23/42 | 5/9/44 | Electric Control Circuit |
| 2,384,937 | " " " | 4/23/42 | 9/18/45 | Electric Valve Translating Apparatus |
| 2,390,982 | Maurice E. Bivens | 9/30/42 | 12/18/45 | Electric Control Circuit |

Briefly, we conclude that the legal defenses of laches and estoppel advanced by Sciaky are well taken, arriving at this decision because of the following facts, which are either admitted or proven.

We find:

■ 1. That General Electric has dealt with Sciaky since 1940 and was well acquainted through trade associations, magazine articles, direct negotiations, conventions, social gatherings, exhibits, prints of the Sciaky three-phase equipment, and in fact through innumerable sources, with every patent, including those in suit, that might affect the welding business, and having such knowledge, endeavored to arrange some kind of a cross-licensing between Sciaky's and its own patents, but failed to do so. Then in August, 1958, long beyond the statute of limitations, for the first time General Electric claimed infringement by Sciaky of its Whiteley '916, Livingston '124, Livingston '937 and Bivens '982 patents although the Sciaky machines allegedly using the accused features had been discussed between them since at least 1948.

(No. 3 went into production in 1945). A three-phase to single phase machine employing anode transformer had even been exhibited in an open house attended by General Electric personnel in October, the same year;

2. Specifically the parties were negotiating for settlement from October 1948 to at least May 1951 regarding the Livingston '553 and Garman '846 patents; and negotiations consisting almost exclusively of offers by General Electric of a number of various patents in exchange for rights to Sciaky's '708 and '083 were made all of which Sciaky refused. To this court these offers might be considered to be a fishing expedition rather than sincere efforts or charge that any of their patents were deemed to be infringed;

3. That there was both laches and estoppel on the part of General Electric in the following instances where General Electric got information concerning Sciaky's patents and machines long before it decided that it ought to file this suit:

(a) The aforementioned October 1943 exposition at the open house in the Sciaky plant, at which several General Electric personnel were present inspecting the Sciaky machines there, which machines embodied adjustment for preheat, weld, post-heat, co-ordinated heat and pressure program—features of infringement now accused by General Electric under their Garman, Whiteley and Bivens patents;

(b) several technical papers covering the same subject matter available to the industry and some of them admittedly seen and read by General Electric;

(c) an article in Steel, October, 1944, Exhibit EV;

(d) Solomon's article in Welding Journal (May 1947, Exhibit EI) regarding heat-pressure program as accused under Whiteley;

(e) installment of the Sciaky machine at Bennett-Ireland Company at Norwich, New York (December 1946, Exhibit S);

(f) Sciaky's machine tested at American Locomotive Company, November, 1947;

(g) drawings made available to General Electric's employees, Exhibit DW;

(h) purchase of five Sciaky welders by Hotpoint Company, a subsidiary of General Electric;

(i) tests at Marion, Indiana power plant, (report contained in Exhibit AF);

(j) conferences between Tetaz and General Electric patent department;

(k) charge by Sciaky back in 1948 that General Electric and its customers were infringing on Sciaky's patents;

(l) meeting in 1949 between David Sciaky and General Electric's patent staff at Schenectady;

(m) General Electric's Byer's letter to General Electric's Bailey, Exhibit DO;

(n) direct negotiations between Mott of General Electric and Sciaky in June 1950, Exhibit DS;

(o) rejection by Sciaky in June 1950 of any settlement between Sciaky and General Electric on basis of free exchange of licenses, Exhibit 60; and

(p) knowledge by General Electric that Sciaky on August 21, 1950 was suing Westinghouse for infringement—answers to interrogatories 11(b) and 11(d).

There were still other instances between the forties and early fifties where the secrets of the Sciaky patents and machines became known to General Electric completely and where those patents and machines did infringe on General Electric patents if General Electric had any faith at all in its now present contention; and yet no action was taken by plaintiff until 1957;

4. Before offering Livingston '553 for cross-licensing in June, 1950,

General Electric issued that letter of July, 1949—to the trade, including Sciaky, as follows:

' "The General Electric Company owns the following patents, among others, relating to control systems for welding apparatus:"

(Several patents covered in that letter but we are now only interested in the following—)

"2,348,553 O. W. Livingston   May 9, 1944
2,390,982 M. E. Bivens   Dec. 18, 1945

"These patents include certain claims applicable to control items sold by the General Electric Company and certain additional claims applicable primarily to complete resistance welding equipment sold by welding machine manufacturers and not by the Company.

"In order that you may understand our policy with respect to patent enforcement, we take this means of assuring you that we have no present intention of asserting any claims in the second category (i. e., claims of the above patents applicable primarily to complete resistance welding equipment sold by welding machine manufacturers) against such manufacturers or their customers. This assurance is in no way conditioned upon the purchase from us, or from any particular source, of components used in apparatus covered by such claims.

"While it is our hope and expectation that we shall be able to continue this policy, we recognize the possibility that future business conditions may require some change. If such a situation should arise, you will, of course, be given ample advance notice of any change proposed, and, in any event, no such change would apply to equipment manufactured prior to such notice."

5. This court interprets this letter to be a grant of immunity to all who might use the above patents, although General Electric claims a narrower interpretation, to-wit, that it did not apply to "control claims". It is our finding of fact to the contrary and we hold that since a copy thereof was actually given to Sciaky this disposes of the matter of both by laches and estoppel entirely as to these two patents—Livingston '553 and Bivens '982. And while the letter does not specifically cover either patent, Sciaky's use of those patents, if any, in its own machines was known to General Electric back in the forties.

6. Neither the Korean war (advanced by General Electric) nor any other happening, can in our opinion, be basis for General Electric's failure to take action on what it then claimed it knew about the Sciaky patents, long before it took action and therefore General Electric's delay is completely unexplainable, unexcusable and unreasonable;

7. Furthermore, we interpret the immunity letter as indicating that General Electric would not sue any welding machine manufacturer, including Sciaky, until the parties taking advantage of the same were notified that there had been a change in General Electric policy. To this very day there has been no such notification given to anybody including Sciaky;

8. We hold and find as a fact that Sciaky could rightfully assume that it was free to use Livingston's '553 and Bivens' '982 and General Electric admits that it never marked the products sold with a patent notice including any of these patents we have in suit;

9. General Electric's failure to proceed against Sciaky was not only unnecessary delay but was beyond the statute of limitations;

10. We find that the immunity letter by General Electric was its attempt to interpret the Mercoid (Mercoid Corporation v. Mid-Continent Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376) in a rather magnanimous manner for the industry and while it may have been well-intentioned, cannot erase the legal effect thereof;

11. Even today General Electric claims that the policy of the immunity letter

still stands and we can find no fact upon which it could base a reason for holding anyone liable for the use of patents that are contained in that immunity letter; and finally the fact that,

12. During· General Electric's silence Sciaky built up an extensive business from 1948 to 1956 particularly in three-phase welders—far outstripping competitors. While it is true that Sciaky did not spell out the cause of its expansive program, necessitated by the development of this machine, it is self-evident that reliance upon General Electric's silence would now result in substantial and irreparable injury to Sciaky if General Electric were not estopped from asserting its claims if it ever had any.

This court does not deem it necessary to extensively cover each of the above instances. It would make this opinion too long and in addition the complete story is in the record. However, it is the finding of this court and our confirmed opinion that it would have been a mental and physical impossibility for General Electric to have remained uninformed (by 1948) concerning all details of Sciaky machines made and on the market at that time and particularly all about patents '083 and '708. To attempt an agreement between itself and Sciaky covering patent rights was commendable but we also find that those conferences and attempts ended before the end of 1951.

### Conclusions of Law

■ We define laches to be the inequity done a party who has changed his position in reliance on an adversary's unreasonable and unexplained delay (or neglect) to seek to enforce a right at a proper time. (See Bouvier's Law Dictionary, Rawle's Third Revision, Vol. 2, p. 1820 et seq.)

In Pearson v. Central Illinois Light Co., 210 F.2d 352, quoting Johnston v. Standard Mining Company, 148 U.S. 360, at page 370, 13 S.Ct. 585, at page 589, 37 L.Ed. 480, the court held—

" * * * the law is well settled that, where the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry."

In Leggett v. Standard Oil Company, 149 U.S. 287, at page 294, 13 S.Ct. 902, at page 904, 37 L.Ed. 737, the court held—

"This lapse of time not only constitutes a bar, such as the statute of limitations interposes, but shows such laches as will clearly preclude any right to relief."

■ To escape laches a party must establish a legal reason in excuse of his delay—Gillons et al. v. Shell Co. of California, 9 Cir., 86 F.2d 600. General Electric has not even attempted to do this.

See also Woodmanse & Hewitt Manuf'g Co. v. Williams, 6 Cir., 68 F. 489; and Ful-Vue Sales Co. et al. v. American Optical Co., D.C., 118 F.Supp. 517.

General Electric has not established any excuse, legal or equitable for its delay.

■ Where there is unreasonable delay beyond the statute of limitations estoppel will lie and in the case at bar in the light of Mercoid Corporation v. Mid-Continent Co., supra, there is even an intimation that General Electric might have been conditioning the use of its patent on the purchase from it of patented or unpatented components or materials. Being unnecessary for this court to decide that point it does give some intimation of why possibly General Electric, if it had any rights, or patents that were being trampled upon, didn't seek to enforce them against Sciaky.

■ And to all this we add the doctrine of estoppel, dependent not only on laches but also because of the statute of limitations. Since the facts show that General Electric slept on any rights it may have had for an unreasonable time, even beyond the period prescribed in the analogous statute of limitations—six

years as established in 35 U.S.C. § 286. There is an assumption that Sciaky suffered damages. Gillons et al. v. Shell Co. of California, supra; Jones v. Perkins, C.C., 76 F. 82; Woodmanse & Hewitt Manuf'g Co. v. Williams, supra; and Whitman v. Walt Disney Prod. Inc., 9 Cir., 263 F.2d 229, at page 230.

Also when suit is brought after statutory time has elapsed, as stated in Kelley v. Boettcher, 10 Cir., 85 F. 55, at page 62—

" * * * the burden is on the complainant to show, by suitable averments in his bill, that it would be inequitable to apply it to his case."

which, of course, was not even attempted by General Electric but was proved by Sciaky.

True, loss of time is not controlling, but when the statute of limitations has passed, damage is presumed and the burden goes back to the party guilty of delay to give some plausible reason therefor. Reconstruction Finance Corporation v. Harrisons & Crosfield, Limited, 204 F. 2d 366, 37 A.L.R.2d 1117; and Shell v. Strong, 10 Cir., 151 F.2d 909.

We have also found as a fact that since General Electric slept on its rights in respect to the four patents before us continuously for thirteen years and in respect to patents referred to in the negotiations between the parties, it was silent three years prior thereto and when negotiations were abandoned, remained dormant for another seven years, and therefore we hold that the above cases apply.

Specifically—excessive delay of this type not only deprives plaintiff of its rights to past damages but operates as equitable estoppel to injunctive relief. See McCallum v. Anderson et al., 10 Cir., 147 F.2d 811; Smith v. Sinclair Refining Company, 2 Cir., 257 F.2d 328 and Gillons v. Shell Co. of California, supra, 86 F.2d at pages 609 and 610 quoting Window Glass Mach. Co. v. Pittsburgh Plate Glass Co., 3 Cir., 284 F. 645, 650, and cases cited therein.

In respect to Bivens and Livingston '553 General Electric is, additionally, estopped from changing its stated position as outlined in its "immunity letter".

" 'Estoppel will be applied to prevent injustices * * * and to transactions in which it would be unconscionable to permit a person to maintain a position inconsistent with one in which he has acquiesced.' " Albert v. Joralemon, 9 Cir., 271 F.2d 236, 241.

quoting from Holmes v. Graves, 83 Ariz. 174, 318 P.2d 354, at page 356.

See also Duffy v. Treide, 4 Cir., 75 F. 2d 17.

Since General Electric's delay is totally unexplained, we cannot resist our conclusion that so far as case 18,338 is concerned, we need give no further attention to the merits of particular patents involved. We are not admitting that General Electric could or could not prove its case concerning these several patents and we are aware that it may be logically concluded that General Electric acted from the highest of motives; but this conclusion might also apply to Sciaky. In any event, the law must be impartial to protect litigants from inequities at the hands of those of good as well as bad intentions. The fact also remains that one having patent rights cannot treat the rights given thereby lightly without having the effect of one's own action used against him when he seeks to claim infringement. See George J. Meyer Mfg. Co. et al. v. Miller Mfg. Co., 7 Cir., 24 F. 2d 505, at page 508; and Overland Motor Co. v. Packard Motor Car Co., 7 Cir., 30 F.2d 497, at page 499.

Perhaps General Electric had some patent rights it could enforce; perhaps it didn't. In any event we think that General Electric waited too long and that passage of time has inured to the detriment of Sciaky which should not be put to further hazards or trials. And we so hold.

16,676

We now come to our decision in the first case filed, which is General Electric

Company, plaintiff v. Sciaky Bros., Inc., defendant, started by General Electric on the 10th day of May, 1957 and in which case Sciaky filed a counter-claim after General Electric had asked for a declaratory judgment to the effect that its goods, particularly equipment of welding machines, did not trespass upon the patent rights of Sciaky's patents—while Sciaky in its counter-claim directed its attention to its patents '708 and '083.

We have necessarily combined our

Findings of Fact and Conclusions of Law

General Electric, plaintiff, as is well known, has many products, and the making of controls for welding machines is only one of them. Defendant, Sciaky, is more specialized in welding machines and after defendant had obtained its patents on '708 and '083 an important segment of General Electric's business was threatened. General Electric claimed, however, that defendant in truth had really no patented invention; that the product of its patents had been all used and were familiar to the prior art; and General Electric's continued connection with the trade was consistent with that attitude. Defendant brought no action against General Electric individually at first but filed a counter-claim for infringement which General Electric (now as defendant) insists, among other reasons, is barred by laches and the statute of limitations.

■ We immediately dispose of the issue of laches because we hold that defendant Sciaky was busily engaged not only in discussing the question of infringement and prior art with plaintiff General Electric but was occupied in legal actions brought or threatened against others who it claimed were infringing its patents. Sciaky did not at that time bring action against this plaintiff but as we understand the law since it was engaged in a similar action against others, it didn't have to sue General Electric. Tompkins v. St. Regis, 2 Cir., 236 F. 221, 225; Clair v. Kastar, Inc., 2 Cir., 148 F. 2d 644.

General Electric also contends that Sciaky was guilty of a misleading delay which allegedly led General Electric to enter into certain save-harmless agreements with its customers concerning the sale and use of controls in question. We disagree.

■ There is *no* fixed period, except as provided in the statute placing time limitation on damages recoverable for patent infringement, limiting time within which patent infringement action must be brought, but diligence must be observed to escape a charge of laches, and whether the complaining party had been diligent under all the circumstances, decides the question of laches; mere lapse of time is not conclusive. See 35 U.S.C.A. § 286.

There was sufficient evidence of activity with regard to Sciaky's diligence that would make it unreasonable for General Electric to rely on Sciaky's supposed "inactivity"—to-wit—

*In 1948* Sciaky notified General Electric of its infringement of Sciaky's patents '083 and '708. These parties were then negotiating for a possible settlement which negotiations extended almost to June 1951;

*In August, 1950* Sciaky sued Westinghouse for infringement of the same patents in issue. In July, 1953 a settlement was reached, and Westinghouse took the contested Sciaky controls from the market;

*In 1956*—With the prospect of a big order from Ford, Sciaky notified the trade generally of its claims under the patents. Sciaky placed possible infringers on guard for forthcoming suits if warning not heeded; and

*In December, 1956*—Sciaky sued McGraw Electric Company (defended by Weltronic) for infringement of its '083 patent. This case resulted in a settlement and Weltronic became a licensee under patent.

In those decisions announcing principles justifying laches amounting to estoppel there is usually found some silence or acquiescence that literally "lulls" the alleged infringer into a sense of security and subsequent change of position. See

Mather v. Ford Motor Co., D.C., 40 F. Supp. 589; Pollitzer et al. v. Foster, 6 Cir., 59 F.2d 901; Remington Rand, Inc., v. Acme Card System Co., D.C., 29 F. Supp. 192. We do not find this true here.

In the instant case, in view of what activity Sciaky had generated, it would be unreasonable to conclude that General Electric was "lulled" into any such security. Sciaky was *not* silent. Besides giving prompt notice of infringement, it was involved in negotiations with General Electric and litigation with competitors.

In the meantime Sciaky informed cross-defendant General Electric that it considered cross-defendant an infringer and its general attitude was an indication that when it had disposed of the suits then pending it would bring an action against General Electric. In fact, Sciaky at one time notified General Electric that if General Electric or anyone, other than Sciaky, supplied certain equipment (for Ford) which Sciaky claimed was covered by '708 and '083 patents, it (Sciaky) would sue that party as an infringer. General Electric did violate this direct threat and furthermore even guaranteed freedom from liability to any and all users of the disputed patents by its immunity letter, frequently referred to in the briefs and record. In other words, we are inclined to believe that General Electric jumped the gun under the theory that the best defense was an attack.

But General Electric does not depend solely on the patents named to substantiate its position. It claims that in the prior art are also the Diamond 2,179,284 and Taylor 1,180,800 patents and the Parker sketch introduced in evidence which are all high frequency multiplication using three winding transformers. Then there is the anode transformer type British patent 385,868 and Livingston '553 followed by the double tube type patents Bosch 2,235,474 and Clark 2,280,-749 and finally the 3 transformer type Kafka 2,175,841 and Livingston '937.

Nevertheless this court holds that try as it could General Electric through its extensive patent department was unable to find any prior art that could do the same thing in the same way to give the same result or that operated on the "accumulation of flux" principle of the '083 Sciaky patent. None of the prior art ever suggested the accumulation of flux by which the anode transformer could be eliminated and the Sciaky principle in our opinion was not obvious to technicians skilled in this art. If the contrary were true certainly the ingenious, resourceful and efficient engineers and inventors in the research department of General Electric would have come up with something during the five years or more from 1943 to 1948 that they were trying desperately to off-set Sciaky's gains in the welding business by leasing, buying, or imitation.

The Sciaky '708 and '083 patents brought something new into welding— particularly the three-phase flux principle, the need for which everybody in the welding business had recognized for years and while today it has now been on the market over fifteen years still nothing has been developed to take its place. Furthermore '708 and '083 Sciaky patents were admittedly a tremendous financial success. So much so that after trying from every angle to get in on the reflected glory of '083 General Electric finally decided to take a chance on inviting a law suit against it for violation of the Sciaky patent claims, still recognizing at the same time that it had to do something *for its customers*. That is where General Electric agreed to continue to hold any and all users of Sciaky patents harmless from any suit if they also could usurp the Sciaky patents, mainly, of course, on General Electric's own theory that it was not, and they would not be, infringing.

The features of the Sciaky invention are well stated in the patents. They relate to an electric valve converting system and give particular reference to a method and apparatus for converting poly-phase power to unidirectional power impulses and then to a form of single phase alternating current. Sciaky thus integrated the effect of the three-phase in the welding transformer itself some-

thing that had never been done before. Sciaky does away with the anode transformer, is without any neutral, and without a multiplication of tubes. The patent itself sets the "on" and "off" time.

At the trial all parties referred to '083 patent as providing for an accumulation of flux and while technically this may not be exact, nevertheless, because of the way the control operates this can be said to be true. It is a combination of control and the three winding transformer that gives the results. This "accumulation of flux" theory is interesting. As often happens, while in theory you cannot accumulate flux and get a useful result in the transformer secondary, it's like the old story of the bumble bee which "in theory" can't fly—but does. Theory fails to note that while a direct current or a current having an average value is applied, the rectifier current also varies, and these variations do produce a useful result in the secondary. This probably is the point which the patent office initially failed to understand. This was and is the heart of the Sciaky "accumulation of flux" principle (a term not liked by most electric engineers since flux produces a useful result only when it changes, not when it is merely accumulated.)

That Sciaky actually was on the right track a whole year earlier is shown in Fig. 1 of Sciaky '947. This figure shows a transformer 29, having an air gap 28. The transformer has no center connection on its winding and herein Sciaky was welding with a direct current impulse only on the primary, no means of reversing the current being present. In theory you cannot do that, but it works.

The air gap in transformer core 29 is the tipoff, since it is this air gap that "absorbs" the effect of the direct current, and allows the varying output of the rectifier to do its work on the welding secondary.

Sciaky had something here, contrary to "theory" and its further elaboration led to the simple three-phase form of '083, when he saw that by repeating Fig. 1 of '947 three times, he no longer needed the anode transformer (a major item of welder cost). He also achieved a useful result in separating the primary windings between phases, as against the common primary winding of his own '708 or Livingston '553.

General Electric's excellent engineers were bound by tradition and evidently believed one got nowhere by putting "direct current" from a rectifier on a transformer primary. In fact the education of that day made sure that you understood this. Thus they continued to look at the welder as a load for a frequency-changer rectifier.

On page 36, paragraph 106 of the blue brief, date March 26, 1960, entitled "Findings of fact * * * proposed by plaintiff, General Electric Company", is mentioned the desirability of having successive low-frequency load impulses alike. In the Sciaky "direct current" system this does not appear to be of great importance, but in any event it is easily controlled in Sciaky '083. Counter to this General Electric, by choosing a "multivibrator" to time its circuit operation, had to develop much of the rest of the control of '553 to synchronize the multivibrator, which is well-known as unstable unless controlled or stabilized.

Livingston '553, Fig. 1, and Sciaky '708, Fig. 1, employ the same basic welder circuit, but differ in control functioning. Livingston was apparently thinking of applying an earlier frequency-changer patent to welding. Sciaky, conscious by earlier efforts, of the necessity for "storage of energy" if peak demands on power system (light flicker, etc.) were to be reduced, was looking for a way to spread the sudden welder load over all three phases of the supply, and to store energy in the transformer core over a period of a few cycles, then to discharge this energy suddenly in the weld. He found it by an unconventional means while General Electric preoccupied in piling circuit upon circuit (Fig. 1 '553) and in following conventional paths, missed the big chance.

This court holds that Sciaky '083 was a new invention because furthermore it

678

included the accumulation of unidirectional flux in the welding transformer from separated phase circuits; each including a separate primary winding for the transformer, and built up a flux successfully in the transformer so that a single protracted current impulse is produced in a single secondary.

In fact there are several differences noted between the patents quoted in the prior art and Sciaky '083. For example the Diamond is a single phase while Sciaky is three phase. Sciaky also eliminates the anode transformers. Diamond does not. Diamond could be used for tin foil or tin cans but nothing heavier Sciaky can weld sheet strips of one inch thickness as well as tiny things such as the Zippo lighter that was introduced as an exhibit.

Diamond is a frequency multiplier. Sciaky is not and Diamond cannot accumulate flux.

The Taylor patent doesn't do anything more and Parker is only a drawing nor can we find that Kafka '841, Livingston '737, British '868 or anything else in the prior art anticipated Sciaky.

It is plain to see that when Sciaky in 1939 had the first "storage of energy" machine he was on the right track although that machine wouldn't work on heavy steel.

■ General Electric claims that Sciaky's '708 and '083 should not have been granted patents. Well in our opinion one of the best proofs that Sciaky's '083 patent was an invention is reflected in the patent office's rejection of '083 (heretofore referred to) when it was first presented as shown by Exhibit CS page 20, but after Sciaky had explained what his machine would do and demonstrated its operation the patent office, which had missed the accumulation of flux principle, withdrew its objections and passed it as a new invention. And previous frequency multipliers did not suggest to the skilled the Sciaky '083 system.

■ This court finds as a fact that General Electric's welding patent depart-ment was put to terrific strain by its higher ups and by the trade to come up with something that would be superior to the Sciaky patent. It couldn't do it. At one time it thought that the three-phase to the one phase system of Sciaky would be too costly but Sciaky's machine proved to be cheaper, easier to install, more economical to run and in many ways superior to anything that was on the market at the time. That was when General Electric then made preparation to copy the Sciaky system practically in toto. It might even be inferred that General Electric not only deliberately knew but wilfully adopted the Sciaky system and by its guaranteeing to save its customers harmless from Sciaky it threw down the gauntlet. In other words it might easily be concluded that General Electric pirated the Sciaky patents '708 and '083 since each had a novel manner of controlling the three-phase welder with the old transformer power circuit, while Sciaky '083 presented an entirely new principle of three-phase welding. But, of course, we make no such direct charge or conclusion. The fact remains that '708 really provides the wave shaping and was a new method of electric welding with a current large in welding heat and small in post-heat. This patent relates to the control problem in electrical resistance welding rather than the power problem as in '083.

"The essence of the '708 patent is to provide 'wave shaping.' The term as used means that a single, unidirectional welding current impulse has its initial or final portions, or both, of substantially different magnitude, so that it can provide preheat or post-heat welding current values, as well as a welding heat current value, in this unbroken unidirectional wave." (DMB 72).

Though this patent was illustrated with an anode transformer power circuit, claims 3 and 6 of this patent show that method can be employed on other types of machines.

'708 has a novel manner of controlling three-phase welding. Though the novel-

ty here was not as significant as in '083, there was sufficient evidence to show that prior art did not anticipate or invalidate the '708 claims.

This court further holds that General Electric time and time again by its admission, acts, inter-office communications admitted not only the unorthodox but feasible welding possibilities of Sciaky but that General Electric had to do something to keep up with the '083 patent.

In civil action 16,676 it is well to note that before the Sciaky patents came on the market the four General Electric patents in suit were in existence. First there was the *Garman* patent applied for in 1939, *2,361,846*, which was known as a heat patent, low heat (preheat) high heat (weld), and low heat (post-heat) with an easily adaptable resistance device determining the relative magnitude of the heat applied during the different intervals. This was a vast improvement on Westinghouse and over the Toulon, Paris, French technique.

Then in 1939-40 came the General Electric *Whiteley* patent *2,315,916* and its electronic control with timers enabling the operator to obtain both a desirable heat program and pressures co-related in time with the heat program.

This was followed by General Electric's *Livingston 2,348,553* invention of 1941 and '42 which had what is known as a reversing current. This patent was highly flexible and enabled the operator to adjust timing intervals.

Finally its last patent in suit was General Electric's *Bivens* patent *2,390,982* which provided for different amounts of heat obtained in each several interval, the duration of the intervals and the turning on and off of the currents during a portion of the heat program. The Bivens principle was developed later on in modern welders according to General Electric to obtain a wide variety of patterns and modes of operation.

These are the four patents which General Electric claims made the major contribution which brought the resistance welding art from its crude 1930 state to

just before the alleged invention of the Sciaky patents in suit. All four patents were in existence before Sciaky and, of course, General Electric claims that Sciaky didn't know much about control features which made the modern welder what it is today. It was in 1944 that the Sciaky inventions '708 and '083 were both offered and General Electric herein claims that Sciaky patent '083 cannot be valid because the essence of its subject matter appeared in an earlier Diamond patent and elsewhere in the prior art (Garman, Whitely, Livingston and Bivens) and as for '708 General Electric claims that Sciaky stole this practically in toto from the Garman patent. This we do not agree with.

It is well at this time to note that in civil action 16,676, General Electric Company in 1957 sought a declaratory judgment to establish its right to sell electric controls for electronic resistance welding machines free from any claim of patent infringement by Sciaky for welding. It also asked that the court hold that all the Sciaky patents be declared invalid and void with a final claim that Sciaky had been guilty of laches.

Briefly General Electric claims that there are only three questions herein involved—

1. Are not '708 and '083 invalid for lack of novelty and lack of invention over the prior art chiefly because of the four General Electric patents;

2. Did Sciaky have any valid patent rights that might have been infringed by the sale of controls by General Electric or by General Electric's customers of welding machines embodying Sciaky controls; and

3. Was Sciaky barred by laches or estopped from asserting its counter-claim in its suit against General Electric?

We disposed of No. 3—laches—earlier in this opinion and, of course, recognize that Sciaky in its counteraction claims an out-right infringement of Sciaky patents '708 and '083 by General Electric and its customers. Sciaky doesn't recognize that General Electric's customers

are welding or making welding machines embodying General Electric controls. It claims General Electric has stolen Sciaky's '708 and '083 patents completely and has encouraged its customers to do the same thing.

As a result of the foregoing, we find that claims 1 to 6 of '083 and claims 3, 4 and 6 of '708 patents are valid and that each of said claims has been infringed.

We hold for Sciaky in both cases and ask it to submit a judgment for our signature.