415 F.2d 1068
 GENERAL ELECTRIC COMPANY, Plaintiff-Appellee,
v.
SCIAKY BROS., INC., and Welding Research, Inc., Defendants-Appellants.
GENERAL ELECTRIC COMPANY, Plaintiff-Cross-Appellant,
v.
SCIAKY BROS., INC., and Welding Research, Inc., Defendants-Cross-Appellees.
 No. 18640.
 No. 18641.
 United States Court of Appeals Sixth Circuit.
 September 4, 1969.
 
 COPYRIGHT MATERIAL OMITTED Dugald S. McDougall, Chicago, Ill., for General Electric Co., David L. Ladd, Chicago Ill., Arthur Raisch, Detroit, Mich., Melvin M. Goldenberg, Washington, D. C., on brief, Martin F. Connor, Lawrence G. Norris, Charlottesville, Va., of counsel.
 Edmund C. Rogers, St. Louis, Mo., for Sciaky Bros., Inc. and Welding Research, Inc., Kingsland, Rogers, Ezell, Eilers & Robbins, St. Louis, Mo., on brief.
 Before EDWARDS, McCREE and COMBS, Circuit Judges.
 EDWARDS, Circuit Judge.
 
 
 1
 These two appeals resulted from a suit originally filed in 1957 in the United States District Court for the Eastern District of Michigan by the General Electric Company. General Electric sought a declaratory judgment establishing invalidity and General Electric's noninfringement of two patents held by Sciaky Bros., Inc., under license from Welding Research, Inc. Sciaky and Welding Research then filed a counterclaim claiming infringement of the two patents by General Electric.
 
 
 2
 Both patents in suit describe method and apparatus for converting multiple or three-phase electric power into single-phase power principally for use in welding machine circuits. The record indicates that they represented an important development in welding machine manufacturing.
 
 
 3
 The early history of this case is set forth in General Electric Co. v. Sciaky Bros., Inc., 187 F.Supp. 667 (E.D.Mich. 1960), and this court's opinion in the appeal of the same-styled case, 304 F.2d 724 (6th Cir. 1962). In this latter opinion Judge (now Chief Judge) Weick for this court affirmed the District Judge in holding that Sciaky's basic patent claims were valid and that General Electric had infringed them.
 
 
 4
 The case was then remanded to the United States District Court for determination of damages. Thereupon the District Judge appointed a Special Master to hear evidence on damages and on the question of willful infringement as related to Sciaky's claim for punitive damages. The Master took extensive testimony and entered a lengthy report (including strong affirmative findings concerning willfulness on the part of General Electric) awarding $668,537.59 compensatory damages, plus interest, and $500,000 in increased damages. A successor District Judge then affirmed the Master's award. Both parties have appealed. General Electric challenges the District Court's findings on the issue of willfulness and the method utilized by the Master in calculating Sciaky's damages, as well as the amount of damages assessed. Sciaky seeks additional damages and interest, as well as an award of attorney fees.
 
 
 5
 Appellant General Electric presents two issues which it states as follows:
 
 
 6
 "(1) The Special Master and the District Court erred in holding General Electric a willful and deliberate infringer and in assessing punitive damages on that account.
 
 
 7
 "(2) The Special Master and the District Court erred in figuring the compensatory damages due Sciaky by a procedure, admittedly contrary to legal precedent, in which `overall income' was calculated without considering fixed overhead expense. This resulted in an award far exceeding Sciaky's normal rate of profit, which, the law says, is the correct measure of damages for lost sales."
 
 WILLFUL INFRINGEMENT
 
 8
 At the outset we observe that we believe that the "clearly erroneous" standard of review applies in this case. In Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), the Supreme Court said:
 
 
 9
 "Where the trial has been by a judge without a jury, the judge's findings must stand unless `clearly erroneous.' Fed.Rules Civ.Proc., 52(a). `A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746. The rule itself applies also to factual inferences from undisputed basic facts, id., at 394, 68 S.Ct. at page 541, as will on many occasions be presented in this area. Cf. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 609-610, 70 S.Ct. 854, 94 L.Ed. 1097." Id. at 291, 80 S.Ct. at 1200. (Emphasis added.)
 
 
 10
 There were two evidentiary hearings in this litigation — one before the District Judge in the original case, and the other before the Master, which produced the record with which this appeal is directly concerned. In both of these hearings witnesses were presented and cross-examined. And, of course, there was opportunity for presentation of other witnesses.
 
 
 11
 General Electric points out that much of the evidence of willfulness upon which Sciaky (and the Master and the District Judge) relied consisted of depositions or letters or reports. And, of course, findings based entirely on such documentary evidence have been construed as subject to closer than normal appellate scrutiny. Seagrave Corp. v. Mount, 212 F.2d 389 (6th Cir. 1954); A. J. Industries, Inc. v. Dayton Steel Foundry Co., 394 F.2d 357 (6th Cir. 1968); 5 J. Moore, Federal Practice ¶¶ 52.04, 53.12[4].
 
 
 12
 But the relating of this documentary evidence to that of the live witnesses could obviously be done best by the hearing officers who saw and heard the witnesses. The record indicates that Sciaky generally presented its own witnesses live but deposed General Electric's employees and tendered their depositions. General Electric, of course, could have but did not call these witnesses to the stand in person. If the District Judge at the original trial and the Master in the hearing on damages were favorably impressed by Sciaky's live witnesses, they had a right to weigh these impressions in the balance while dealing with the often conflicting statements contained in the documentary evidence. And in any event, as the Supreme Court pointed out in Duberstein, supra, the clearly erroneous rule, Fed. R.Civ.P. 52(a), applies to factual inferences drawn from undisputed facts.[1]
 
 
 13
 Although the District Judge in the original trial did not squarely pass upon the issues of willfulness and punitive damages, he did note:
 
 
 14
 "This court finds as a fact that General Electric's welding patent department was put to terrific strain by its higher ups and by the trade to come up with something that would be superior to the Sciaky patent. It couldn't do it. At one time it thought that the three-phase to the one phase system of Sciaky would be too costly but Sciaky's machine proved to be cheaper, easier to install, more economical to run and in many ways superior to anything that was on the market at the time. That was when General Electric then made preparation to copy the Sciaky system practically in toto. It might even be inferred that General Electric not only deliberately knew but wilfully adopted the Sciaky system and by its guaranteeing to save its customers harmless from Sciaky it threw down the gauntlet. In other words it might easily be concluded that General Electric pirated the Sciaky patents '708 and '083 since each had a novel manner of controlling the three-phase welder with the old transformer power circuit, while Sciaky '083 presented an entirely new principle of three-phase welding. But, of course, we make no such direct charge or conclusion." General Electric Co. v. Sciaky Bros., Inc., 187 F.Supp. 667, 678 (E.D.Mich. 1960).
 
 
 15
 In the second trial the Master entered the following findings as to which the successor District Judge found "adequate basis in the record to support the master's finding of wilful infringement":
 
 
 16
 "50. The Master finds that General Electric wilfully and deliberately infringed Sciaky's patents in suit, and for that reason the damages to be paid to Sciaky by General Electric should be increased.
 
 
 17
 "51. The Master finds that General Electric's welding patent department was put to terrific strain by its higher-ups and by the trade to come up with something that would be superior to the Sciaky patents. It couldn't do it. At one time it thought that the three phase to the one phase system of Sciaky would be too costly but Sciaky's machine proved to be cheaper, easier to install, more economical to run and in many ways superior to anything that was on the market at the time. That was when General Electric then made preparation to copy the Sciaky system practically in toto. General Electric not only deliberately knew but wilfully adopted the Sciaky system and by its guaranteeing to save its customers harmless from Sciaky, even before it had sold a single control, threw down the gauntlet. It is clear that General Electric pirated the Sciaky patents in suit since each had a novel manner of controlling the three phase welder with the old transformer power circuit while Sciaky's '083 presented an entirely new principle of three phase welding. These are some of the reasons why the Master finds that General Electric is a wilful and deliberate infringer.
 
 
 18
 "52. The Master finds that the opinion given by the General Electric patent department to its interested personnel, stating General Electric had the right to copy the Sciaky patented machine, was not a sincere one. That it was given even though both the General Electric patent department as well as its searching department in Washington admitted that Sciaky would be able to obtain a patent or patents on its inventions. The General Electric patent department relied on prior art, which its Washington associate characterized as being of little value. The General Electric patent department submitted its opinion to the patent department of General Electric English affiliate, and was warned that the opinion was not sound. To hedge on the opinion, the General Electric patent department urged a settlement with Sciaky and also advised the General Electric welding department, that if a suit were brought by Sciaky, the welding department should be warned that the entire costs and damages, if any, would be charged directly against that department.
 
 
 19
 "53. The Master finds that the manner in which General Electric brought its two law suits against Sciaky clearly bolsters the Master's finding, that General Electric realized it was a wilful and deliberate infringer from the start and that these suits were filed as a last resort to force Sciaky to come to some settlement with General Electric.
 
 
 20
 "54. The Master further finds that the various legal opinions relating to Sciaky's patents, rendered to General Electric eight years after it had commenced its wilful and deliberate infringement were necessarily colored by the situation the attorneys found General Electric to be in at that time. The opinions are also immaterial for they could not excuse General Electric's deliberate and wilful infringement which it had commenced eight years before these opinions were supplied.
 
 
 21
 "55. The Master therefore finds that because of General Electric's wilful and deliberate infringement of Sciaky's patents the damages which General Electric be required to pay to Sciaky shall be increased in the sum of $500,000.00."
 
 
 22
 The District Judge adopted the report of the Master, noting that the fact findings of a master cannot be set aside in patent infringement cases unless clearly erroneous. Fed.R.Civ.P. 53(e)(2) ("In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous. * * *"); Tilotson Mfg. Co. v. Textron, Inc., 337 F.2d 833, 841 (6th Cir. 1964); Patrol Valve Co. v. Robertshaw-Fulton Controls Co., 210 F.2d 146, 152 (6th Cir. 1954). See also, Tilghman v. Proctor, 125 U.S. 136, 149-150, 8 S.Ct. 894, 31 L.Ed. 664 (1888).
 
 
 23
 And, as we have previously noted, where the District Court adopts the Master's findings of fact, Fed.R.Civ. P. 52(a) provides that such findings "shall be considered as the findings of the court" which cannot be set aside unless "clearly erroneous."
 
 
 24
 This case, of course, begins with final judgments that Sciaky's patents are valid and that General Electric infringed them. Further, the commercial value of the Sciaky patents and their great competitive impact upon General Electric's welding machine controls business is firmly established by this record. As to General Electric's decision to infringe, General Electric's brief does not dispute that "General Electric tried out the Sciaky system, decided it was good, tried to find something better, couldn't do so, and elected to market it in competition with Sciaky."
 
 
 25
 But General Electric in effect contends it was entitled to take the action that it took without being found guilty of "willful infringement" because it had an "honest doubt"[2] about the validity of Sciaky's patents. In this regard it relies particularly upon a patent "clearance" by its own patent department and a long subsequent patent opinion from a private patent firm. Of course, we recognize that a good-faith opinion by competent and independent patent counsel may be important evidence to be weighed on the issue of "honest doubt" of patent validity. Continental Can Co. v. Anchor Hocking Glass Corp., 362 F.2d 123 (7th Cir. 1966); Union Carbide Corp. v. Graver Tank & Mfg. Co., Inc., 282 F.2d 653 (7th Cir. 1960), cert. denied, 365 U.S. 812, 81 S.Ct. 692, 5 L.Ed.2d 691 (1961). But we do not consider the "patent clearance" eventually issued by General Electric's own patent department to be conclusive on this issue under the facts of this case. McCulloch Motors Corp. v. Oregon Saw Chair Corp., 245 F.Supp. 851 (S.D.Cal. 1965).
 
 
 26
 We believe that there are important factors contained in this record which supply a strong factual basis for the Master's and the District Judge's rejection of the "honest doubt" defense. Among these are the following:
 
 
 27
 1. General Electric's own patent department expressed serious doubts about General Electric's patent position vis-a-vis Sciaky.
 
 
 28
 2. No outside counsel was consulted on a matter of such great importance as this prior to the decision to infringe.
 
 
 29
 3. The British subsidiary of General Electric wrote a patent letter warning that Sciaky would get patents.
 
 
 30
 4. The General Electric patent department, immediately after its clearance letter, warned the control division of General Electric that it would have to bear any costs of patent litigation.
 
 
 31
 5. After the initiation of the instant case, General Electric researched and filed an infringement action against Sciaky concerning eight patents which General Electric held, although there is no indication of any prior General Electric interest in claiming such infringements. Concerning this litigation one of General Electric's patent attorneys stated before the District Court in the first trial:
 
 
 32
 "Somebody then in General Electric said, `We have got a lot of patents, haven't we?' And somebody said, `Yes.' `What are we doing with them?' `They are sitting over there in the file.' `Well, that doesn't seem very sensible, why doesn't somebody look them up and see what they are, see who is infringing on these things, and why not start with Mr. Sciaky.' And so they did, and they found eight patents in the General Electric portfolio that appeared to be infringed by Sciaky.
 
 
 33
 * * * * * *
 
 
 34
 "I don't think anybody is very proud of this on the General Electric side, but nevertheless, they finally got around to it and the net result was that a second complaint was filed and this is a straight conventional garden variety patent infringment suit by General Electric against Sciaky, charging Sciaky with infringement on these 8 patents."
 
 
 35
 6. General Electric copied Sciaky's inventions in toto.
 
 
 36
 7. It waited to do so until Sciaky had achieved considerable commerical success with them and had put General Electric's control department under serious competitive pressure.
 
 
 37
 On this entire record we do not believe we can declare the Master's (and the District Judge's) findings of willfulness to be "clearly erroneous." And if we were required to judge the documentary evidence on this issue de novo (Cf. United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L. Ed.2d 415 (1966)), we would find (as did the Master and the District Judge) that General Electric's infringement was both willful and deliberate.
 
 OVERHEAD EXPENSE
 
 38
 General Electric's second claim of reversible error is that the Master allowed Sciaky damages from lost sales due to General Electric's patent infringement which disregarded fixed overhead expense.
 
 
 39
 The applicable statute concerning damages provides:
 
 
 40
 "§ 284. Damages
 
 
 41
 "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.
 
 
 42
 "When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.
 
 
 43
 "The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances." 35 U.S.C. § 284 (1964).
 
 
 44
 As to this issue, the District Judge's Memorandum Opinion said:
 
 
 45
 "The master found that 92 infringing machines were sold by General Electric or its original equipment manufacturers during the accounting period, 50 of which would in all reasonable probability have been sold by Sciaky, but for the infringement. As to these fifty machines, the master calculated Sciaky's damages by considering on an individual basis what profit Sciaky would have made had it manufactured and sold each of the infringing machines. In using this approach, the question arises, as pointed out at page 16 of the report, as to whether Sciaky should have charged a portion of the fixed general overhead expenses against each equivalent machine as an added expense, thereby reducing its lost profit by the amount of added expense. The court observes that Sciaky introduced the testimony of two experts to support its theory in not charging fixed expense to the profits it would have earned on an equivalent machine; General Electric offered no testimony to contradict this contention. Furthermore, the court finds that the master's decision not to charge fixed expenses to the equivalent machine in determining Sciaky's loss of income or overall damages as to each machine is the correct procedure inasmuch as it compensates Sciaky for all the income which it in fact did lose as a result of the infringement, in accordance with § 284."
 
 
 46
 We can, we think, be succinct in dealing with this issue. General Electric really seeks to present it as an issue of law, claiming in effect that this court should reverse the District Court because Sciaky's expert accountants' testimony was in error in its treatment of the general overhead item of expense. The record is clear that the accounting presented by Sciaky's witnesses and accepted by the Master and the District Judge did include some overhead expenses, but it is also clear that general fixed overhead expenses such as officers' salaries, realty taxes, insurance, etc., were not charged to the individual sales for loss of which damages were awarded. Sciaky's expert accountant witnesses testified that these general overhead expenses were paid by Sciaky during the years in question and would not have been greater if these additional machines had been produced and sold by Sciaky. While General Electric vigorously disputes this theory, it is by no means novel in patent damage cases. See Electric Pipe Line, Inc. v. Fluid Systems, 250 F.2d 697 (2d Cir. 1957); Riverside Heights Orange Growers' Ass'n v. Stebler, 240 F. 703, 712-713 (9th Cir. 1917).
 
 
 47
 Whether Sciaky's accounting method was accurate or not was a matter to be decided on the basis of testimony in the hearing before the Master. This was the specific function of that hearing. We do not believe that this issue can properly be decided as a matter of law before this court on appeal.
 
 
 48
 Since General Electric failed to present any expert testimony on the accounting issue at the hearing before the Master, it cannot point to any evidence which would lead us to conclude that the Master's finding based on Sciaky's accountants' testimony was clearly erroneous. On this issue, too, we affirm the District Judge's confirmation of the Master's report and recommendation.
 
 
 49
 When we turn from the issues presented by the General Electric appeal to those presented by Sciaky, we find the same denunciations of the Master's failure adequately to assess and analyze the evidence which he heard. Like the District Judge, we find these attacks no more persuasive in Sciaky's appeal than we did those in General Electric's.
 
 DAMAGES FOR LOST SALES
 
 50
 Sciaky's first claim is that it should have been awarded damages for lost sales not for 50 machines, as found by the Master and District Judge, but for all 92 of the infringing machines which were built in the years in issue. We believe the Master and the District Judge followed the correct legal theory in determining this issue as set forth in Aro Mfg. Co. v. Convertible Top Replacement Co., Inc., 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964):
 
 
 51
 "[T]he present statutory rule is that only `damages' may be recovered. These have been defined by this Court as `compensation for the pecuniary loss he [the patentee] has suffered from the infringement, without regard to the question whether the defendant has gained or lost by his unlawful acts.' Coupe v. Royer, 155 U.S. 565, 582, 15 S.Ct. 199, 39 L.Ed. 263. They have been said to constitute `the difference between his pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred.' Yale Lock Mfg. Co. v. Sargent, 117 U.S. 536, 552, 6 S.Ct. 934, 29 L.Ed. 954. The question to be asked in determining damages is `how much had the Patent Holder and Licensee suffered by the infringement. And that question [is] primarily: had the Infringer not infringed, what would Patent Holder-Licensee have made?' Livesay Window Co. v. Livesay Industries, Inc., supra, 251 F.2d [469] at 471 [(5th Cir. 1958)]." Id. at 507, 84 S.Ct. at 1543.
 
 
 52
 It is clear that in this case Sciaky had important competitors other than General Electric in the welding machinery business and that it did not bid on the machines which the Master eliminated from his calculations. We have read and reviewed and approve the findings of fact in relation to the individual machine transactions as set forth in the careful analysis by the Master. Certainly, we cannot hold that the District Judge's affirmance of the Master's report in regard to this issue was clearly erroneous.
 
 DAMAGES FROM INFRINGING USE
 
 53
 As a matter of law, we believe the Master and the District Judge were correct in rejecting Sciaky's claim for damages against General Electric due to "use" by others of other infringing machines. These machines had all been sold more than six years before the beginning of the accounting period. General Electric's last contact with these machines was more than six years before Sciaky's claim. The Patent Act, 35 U.S. C. § 286 (1964), says in part:
 
 
 54
 "* * * no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action."
 
 
 55
 Further, as the Master found, Sciaky offered no proofs either as to use of the infringing machines or damages to Sciaky resulting from such use during the accounting period.
 
 INTEREST AND ATTORNEYS' FEES
 
 56
 The last two issues which Sciaky presents concern its claims that under the facts of this case the Master and the District Judge had the legal obligation to allow for computation of two additional damage items.
 
 On these issues the District Judge said:
 
 57
 "The master found that General Electric should pay Sciaky 6 per cent interest on the total award of damages, such interest to commence running on the date the report is filed with the clerk of the court. Sciaky contends it is entitled to interest as of the date of the last infringement. The court finds that the matter of when interest should commence to run is discretionary with the court under § 284 in cases such as this involving wilful infringement. See Duplate Corp. v. Triplex Safety Glass Co., 298 U.S. 448 [56 S.Ct. 792, 80 L.Ed. 1274] (1936). Were wilful infringement not found, the rule would require interest to run as of the date damages were liquidated. Wm. Bros. Boiler and Mfg. Co. v. Gibson-Stewart Co., Inc., 312 F.2d 385 (6th Cir. 1963). The court, however, in its discretion, adopts the recommendation of the master that interest should begin to run as of the date of filing of the report. If the award of interest as of the date of the last infringement were mandatory in this case, the court would subtract the amount of such additional interest from the $500,000 awarded Sciaky as increased damages upon the finding of wilfulness.
 
 
 58
 "The question of attorney fees was not considered by the master since he was limited in the order of reference to an assessment of damages under § 284. The statute providing for the award of attorney fees in patent litigation is § 285, which reads as follows:
 
 
 59
 "`The court in exceptional cases may award reasonable attorney fees to the prevailing party.'
 
 
 60
 The court finds that the award of attorney fees in a case like this involving wilful infringement is within the sound discretion of the court. Hoge Warren Zimmermann Co. v. Nourse & Co., 293 F.2d 779 (6th Cir. 1961). The court further finds that the increase of Sciaky's recovery of $500,000 adequately compensates it for the extra damages which it suffered as a result of General Electric's wilfulness. Accordingly, the court denies Sciaky an award of attorney fees."
 
 
 61
 It is hard to see how the District Judge could more positively have indicated his inclination to exercise his judicial discretion in the negative as to these two issues. And it appears to this court that the statutory provision for additional damages,[3] for interest[4] and for attorneys' fees[5] are all made discretionary with the District Judge.
 
 
 62
 We note, of course, that on the interest issue, both House and Senate reports on prior versions of 35 U.S.C. § 284 did contain language which could have been construed as a mandate to the District Court to award interest back to the date of infringement.[6] Whatever prior versions of the bill or earlier committee reports may have stated, however, the critical fact is that the bill was amended so as to delete the reference to "interest from the time the infringement occurred." Under these circumstances, we do not see how we can say that the Master or the District Judge erred as a matter of law or how either could be held to have abused his discretion.
 
 
 63
 The judgment of the District Court is affirmed.
 
 
 
 Notes:
 
 
 [1]
 Note discussion of this issue in Lundgren v. Freeman, 307 F.2d 104, 113-115 (9th Cir. 1962)
 
 
 [2]
 International Mfg. Co., Inc. v. Landon, Inc., 336 F.2d 723, 728 (9th Cir. 1964),cert. denied, Jacuzzi Bros., Inc. v. Landon, Inc., 379 U.S. 988, 85 S.Ct. 701, 13 L.Ed.2d 610 (1965); Upjohn Co. v. Italian Drugs Importing Co., 190 F.Supp. 361, 367 (S.D.N.Y.1961). See Artmoore Co. v. Dayless Mfg. Co., 208 F.2d 1, 5 (7th Cir. 1953), cert. denied, 347 U.S. 920, 74 S.Ct. 518, 98 L.Ed. 1075 (1954).
 
 
 [3]
 "When the damages are not found by a jury, the court shall assess them. In either eventthe court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284 (1964). (Emphasis added.)
 
 
 [4]
 "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer,together with interest and costs as fixed by the court." 35 U.S.C. § 284 (1964). (Emphasis added.)
 
 
 [5]
 "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285 (1964). (Emphasis added.)
 
 
 [6]
 H.R.Rep.No.1587, 79th Cong., 2d Sess. 1 (1946); S.Rep.No.1503, 79th Cong., 2d Sess. 2 (1946)